# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 06-CV-5716 (JFB) (AKT)

## JOHN MANGINO AND ELAINE MANGINO,

Plaintiffs,

VERSUS

## INCORPORATED VILLAGE OF PATCHOGUE, FIRE MARSHALL JOHN P. POULOS, CODE ENFORCEMENT OFFICER JAMES NUDO, PATCHOGUE FIRE DEPARTMENT, FIRE CHIEF JOSEPH WAGONER, UNIDENTIFIED EMPLOYEES AND AGENTS OF THE INCORPORATED VILLAGE OF PATCHOGUE AND UNIDENTIFIED EMPLOYEES AND AGENTS OF THE PATCHOGUE FIRE DEPARTMENT,

Defendants.

### MEMORANDUM AND ORDER
September 23, 2010

JOSEPH F. BIANCO, District Judge:

On October 23, 2006, pursuant to 42 U.S.C. § 1983, plaintiffs John Mangino ("Mr. Mangino") and Elaine Mangino ("Ms. Mangino") (together "plaintiffs") brought this action against defendants Incorporated Village of Patchogue ("the Village" or "Patchogue"), Fire Marshall John P. Poulos ("Poulos"), Code Enforcement Officer James Nudo ("Nudo"), the Patchogue Fire Department[1] ("the Fire Department"), Fire

Chief Joseph Wagner ("Wagner"), Unidentified Employees and Agents of the Incorporated Village of Patchogue and Unidentified Employees and Agents of the Patchogue Fire Department,[2] (collectively

However, because the entity has been referred to as the "Patchogue Fire Department" throughout the course of this case, the Court refers to it as the Patchogue Fire Department.

[2] For ease of reference in this Memorandum & Order, the Patchogue Fire Department, Joseph Wagner, and unidentified employees and agents of the Fire Department are referred to collectively as "the Fire Department defendants." The Village of

[1] The proper name of the fire department in Patchogue is the Patchogue Fire District.

"defendants"), alleging that defendants violated plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution. Plaintiffs also allege claims for conspiracy under § 1983 against the Fire Department defendants and claims for municipal liability against the Fire Department and the Village. The Fire Department defendants and the Village defendants now move, separately, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motions are granted in part and denied in part. In particular, the Court grants the Fire Department defendants' motion for summary judgment in its entirety. The Court denies the Village defendants' motion for summary judgment with respect to plaintiffs' malicious abuse of process claim, Fourth Amendment unreasonable search claim as pertaining to the basement at 21 Church Street, and municipal liability. The Court grants the Village defendants' motion for summary judgment on the remaining claims.

## I. FACTS

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2001). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no

Patchogue, Poulos, Nudo, and the unidentified employees and agents of the Village are referred to collectively as "the Village defendants."

evidence in the record to contradict it.

### A. Background

As of October 2007, plaintiff John Mangino was the owner of 21 Church Street in Patchogue, New York. (Pl. Vill. 56.1 ¶ 1.)[3] Mr. Mangino and his wife, plaintiff Elaine Mangino, purchased 21 Church Street some time between 2001 and 2003. (*Id.* ¶ 2.) There were eight tenants living at 21 Church Street when plaintiffs acquired the property. (*Id.* ¶ 12.) Mr. Mangino became the sole owner of 21 Church Street on September 6, 2005. (*Id.* ¶ 3.) Mr. Mangino never resided at 21 Church Street or in the Village of Patchogue. (*Id.* ¶¶ 4-5.)[4] 21 Church Street was a three-story, wood-framed, eight-family apartment house that was built in approximately 1900. (*Id.* ¶¶ 10-11.) There were three apartments on the first floor, four apartments/ boarding rooms on the second floor, and one apartment on the third floor. (*Id.* ¶ 13.) The boarding rooms on the second floor shared one bathroom. (*Id.* ¶¶ 14-15.) Apartments 2, 3, 4, 5, and 6 used the main lobby door as an entrance to the apartment building. (*Id.* ¶ 17.) The building

[3] The Court refers to the 56.1 statement submitted by the plaintiffs in opposition to the Village defendants' motion for summary judgment as "Pl. Vill. 56.1." The Court refers to the 56.1 statement submitted by plaintiffs in opposition to the Fire Department defendants' motion for summary judgment as "Pl. FD 56.1." The Court refers to the defendants' 56.1 statements as "Vill. 56.1" and "FD 56.1," respectively.

[4] As of October 2007, Mr. Mangino also owned 448 South Ocean Avenue in Patchogue, New York, which he had purchased in January 2005. (*Id.* ¶ 7.) 448 South Ocean Avenue was a three to four family house, at which plaintiffs never resided. (*Id.* ¶¶ 8-9.) 448 South Ocean Avenue is not the subject of the claims in the instant lawsuit.

also had a basement that was used for storage. (*Id.* ¶¶ 17-18.) Plaintiffs charged some tenants an additional fee in order to use the basement for personal storage. (*Id.* ¶ 20.) Mr. Mangino also maintained a double-locked private room in the basement with security equipment set up in the room, as well as other personal items. (*Id.* ¶ 19.) The tenants could not access this room.

## B. The Rental Permit Law

In 1997, the Village of Patchogue Board of Trustees enacted Local Law No. 8 to add Chapter 56 of the Village Code to regulate rental dwelling units. (*Id.* ¶ 22.) The stated purpose of the law is that the "public health, safety, welfare, and good order governance of the Village of Patchogue will be enhanced by the enactment of Chapter 56." (*Id.* ¶ 23.) The Rental Permit Law applies to "all Rental Dwelling Units located within the Village of Patchogue." (*Id.* ¶ 25.) According to the terms of the Rental Permit Law:

> It shall be unlawful and a violation of this Article and an offense within the meaning of the Penal Law of the State of New York for any person or entity who owns a Dwelling Unit in the Village of Patchogue to use, establish, maintain, operate, let, lease, rent or suffer or permit the occupancy and use thereof as a Rental Occupancy by someone other than the owner or his immediate family, without first having obtained a valid Rental Occupancy Permit therefor. Failure or refusal to procure a Rental Occupancy Permit hereunder shall be deemed a violation.

Rental Permit Law § 56-4(A). A property owner who desires to rent out a dwelling unit is thus required to obtain a rental occupancy permit from the Village Building Department. Rental Permit Law §56-5(B).

## C. Village Housing Inspector James Nudo

Defendant James Nudo was employed as the Housing Inspector and Code Enforcement Officer for the Village of Patchogue from 1992 until 2006. (Pl. Vill. 56.1 ¶¶ 33-34.) Nudo's job required him to perform field inspections of houses and enforce the Village Code. (*Id.* ¶ 35.) Nudo was also required to investigate complaints and issue summonses for non-compliance with the Village Code; Nudo had the authority to determine whether to issue a summons in a given situation. (*Id.* ¶¶ 35-36.) Nudo's primary job, as Village Housing Inspector, was to perform rental inspections. (*Id.* ¶ 37.)

A Village Housing Inspector has discretion to issue tickets to a landlord for failing to secure a rental occupancy permit. (Vill. 56.1 ¶ 117.) The decision of whether to issue a summons is based upon the number and seriousness of the offense(s). (*Id.* ¶ 118.) Moreover, each day that a property is in violation of the Village Code is a separate violation. (*Id.* ¶¶ 120-21.)

## D. Plaintiffs' Rental Permit History and January 2005 Tickets

Plaintiffs applied for a two-year rental permit when they purchased 21 Church Street. (Pl. Vill. 56.1 ¶ 38.) When plaintiffs submitted their application, in or about 2002, Nudo conducted a rental occupancy permit inspection, during which he took notes regarding his observations at the premises. (*Id.* ¶¶ 39-41.) Both plaintiffs and the Village defendants acknowledge that the inspection by

defendant Nudo was tense, but the precise details of any exchanges between the parties are disputed. (*Compare* Vill. 56.1 ¶¶ 42-45 *with* Pl. 56.1 ¶¶ 42-45.) Due to their disagreements, Nudo left 21 Church Street without finishing the inspection. (Vill. 56.1 ¶ 56.) Housing Inspector William Powell went to 21 Church Street to finish the rental occupancy permit inspection. (*Id.* ¶ 47.) Plaintiffs were not issued any violations or tickets at that time. (*Id.* ¶ 49.)

On February 2, 2002, Mrs. Mangino was issued a rental occupancy permit for 21 Church Street. (*Id.* ¶ 50.) Plaintiffs paid a $200 flat fee for a two-year eight-unit dwelling rental occupancy permit for the property. (*Id.* ¶ 51.) This permit expired in approximately 2004. (*Id.* ¶ 52.) Plaintiffs refused to renew their rental occupancy permit for 21 Church Street. (*Id.* ¶ 53.) As of October 2007, Mr. Mangino still did not have a valid rental occupancy permit for 21 Church Street. (*Id.* ¶ 54.)

Plaintiffs' rental occupancy permit expired in or around February 2004. (Vill. 56.1 ¶ 60.) Mr. Mangino was aware that the Village Code required that the owner of a dwelling unit obtain a rental occupancy permit prior to renting the dwelling, and the Village mailed a rental occupancy permit renewal application for 21 Church Street prior to January 2005. (*Id.* ¶¶ 61-62.) Plaintiffs did not renew their rental occupancy permit. According to plaintiffs, they did not do so because the Village "raised the rental permit fee five to ten times over the previous levels, charged non-owner occupied houses different than owner occupied houses, [and] effectuated other questionable practices." (Pl. Vill. 56.1 ¶ 64.)

According to Nudo's testimony, while driving around the Village in January 2005, he drove by 21 Church Street and saw some broken or missing screens and a rip in the screen door. (*Id.* ¶ 65.) Nudo testified that he thereafter checked the property files to see when 21 Church Street was due for a rental occupancy permit inspection. (*Id.* ¶ 66.) Nudo noticed, and Mr. Mangino concedes, that as of January 2005, 21 Church Street did not have a valid rental occupancy permit. (*Id.* ¶¶ 68, 70.) On January 12, 2005, Nudo issued appearance tickets to plaintiffs for their failure to apply for or secure a rental permit for 21 Church Street as required by the Village Code. (Vill. 56.1 ¶ 72.) Each plaintiff received a summons because, as co-owners of the property, each was responsible for obtaining a rental occupancy permit. (*Id.* ¶ 73.)

After being issued these summonses in January 2005 for failure to obtain a rental permit, plaintiffs challenged the summonses in court. They challenged both the individual summonses and the validity of the rental permit law, as well as the manner of service of the tickets by the Village defendants. (Pl. Vill. 56.1 ¶ 81.) While their challenge to the tickets was ongoing, plaintiffs allege that the Village prosecutor threatened plaintiffs, stating that if they did not settle the pending litigation against the Village (challenging their tickets and the constitutionality of the permit law)—or accept a plea bargain—they would be hit with a barrage of summonses. (*Id.*; *see also* Pl. Ex. 5 Notice of Claim 11-15-06; Raskin Dep. at 132-33; Mangino 50-h 3-16-07 at 92-100, 201.)

E. Elinor Kolb's Complaints

In 2005, Elinor Kolb was a resident in Apartment 5 at 21 Church Street. (Vill. 56.1 ¶ 143.) Kolb visited the Village Housing Department to complain about 21 Church Street (*id.* ¶ 144), however, the parties dispute

4

the frequency of Kolb's visits to the Housing Department. The Village documented Kolb's visits to the Housing Department on two occasions: May 6, 2005 and July 22, 2005. (Pl. Vill. 56.1 ¶ 145.) On May 6, 2005, Kolb filed a written complaint with the Housing Department stating that the bathroom sink and bathtub on the second floor of 21 Church Street were clogged and unusable. (Vill. 56.1 ¶¶ 146-47.)[5] This bathroom was shared by three tenants, and Kolb also complained that the bathroom was filthy and vandalized. (*Id.* ¶¶ 149-50.) Kolb stated that Mr. Mangino was aware of the problem with the sink but had not repaired it or called a plumber after seven days. (Pl. Vill. 56.1 ¶ 148.) Kolb also stated that she was afraid of Mr. Mangino and feared that he would evict her, but plaintiffs dispute the veracity of this statement. (*Id.* ¶ 152-53.)

On July 22, 2005, Kolb went to the Housing Department and stated that she was having additional issues with 21 Church Street. (*Id.* ¶ 156.) According to the incident report, Kolb stated that the "toilet does not flush properly and the bathroom is shared with other tenants." (*Id.*; Vill. 56.1 ¶¶ 158-60.) The Village did not follow up on Kolb's complaint at that time.

### F. Apartment 2

Dawn Gucciardo ("Gucciardo") was a resident of 21 Church Street who resided in Apartment 2 from November 2004 until October 2005. (Vill. 56.1 ¶ 165.) Gucciardo had one child and was pregnant with a second when she moved into Apartment 2. (*Id.* ¶ 166.) Gucciardo lived in Apartment 2 with her two children, and, periodically, her boyfriend also stayed with her. (*Id.* ¶ 167.) Gucciardo's lease stated that the rent was $950 per month, but Mr. Mangino and Gucciardo both testified that they believed it was $900 per month or $1200 per month, with the Department of Social Services ("DSS") paying $900 per month. (Pl. Vill. 56.1 ¶ 170.) Gucciardo's rent was paid, in part or in full, by DSS. (*Id.* ¶ 171.) Pursuant to a separate agreement with Mr. Mangino, Gucciardo paid a fee in order to store a few boxes in the basement and for the additional tenants (her newborn child and, possibly, her boyfriend) that resided in the apartment with her since the date on which she signed the lease. (*Id.* ¶¶ 172-73.)

As of October 2007, there had been two fires at 21 Church Street since plaintiffs purchased it—one involving a refrigerator, and another involving a candle next to a drape.[6] (*Id.* ¶ 187.) On May 9, 2004, the Patchogue Fire Department responded to a reported structural fire at 21 Church Street. (*Id.* ¶ 188.) An electrical fire was found in Apartment 2; specifically, there was a fire in the refrigerator motor/switch. (*Id.* ¶ 189.) The electrical outlet in the kitchen was "damaged" and "burned from the fire." (*Id.* ¶ 191.) Defendant Poulos, the Village's Chief Fire Marshal, responded to the fire in Apartment 2 and determined that the refrigerator was the point of origin of the fire. (*Id.* ¶¶ 192-93.) According to Poulos's fire report, on May 9, 2004, "[t]he most burnt area was around the electrical switch mounted to

---

[5] Plaintiffs assert that Kolb had a "fragile mental state" and complained about rather basic, non-problematic issues, such as that "she has to wait for the hot water to get hot when she turned it on." (*See, e.g.*, Pl. Vill. 56.1 ¶ 147, 163.) The parties dispute whether Kolb's complaints were of a serious nature. (*See id.*)

[6] The second fire involving the candle occurred in October 2005, after the dates of the significant events at issue in this action. (Pl. Vill. 56.1 ¶¶ 187, 204-06.)

the . . . right hand side wall about two inches [above] the floor." (Pl. Ex. 70, Poulos Fire Report 5-9-04.) As a result of the incident, Mr. Mangino was issued a Fire Prevention Order. (Vill. 56.1 ¶ 197.) The electrical outlet in the kitchen had to be repaired as a result of the fire because it was melted. (Pl. Vill. 56.1 ¶ 198.)

After the fire, the electrical system in Apartment 2 had to be certified by a licensed electrician, all smoke detectors in the house had to be checked, the sprinkler system had to be tested and certified, and the fire escape had to be repainted. (Vill. 56.1 ¶¶ 199-202.) Mr. Mangino complied with the Fire Prevention Order. (*Id.* ¶ 203.)

## G. John Poulos

Defendant John Poulos became the Village Chief Fire Marshal in 2003. (Vill. 56.1 ¶ 174.) Prior to his employment with the Village, Poulos had been trained at the Fire Academy, had a background in fire prevention, was a New York City firefighter, and was a certified Fire Marshal and investigator. (*Id.* ¶ 175.) Poulos had also passed the civil service exam for New York City Fire Lieutenant. (*Id.* ¶ 176.) As of October 2007, Poulos had twenty-seven years of experience as a firefighter. (*Id.* ¶ 177.) Poulos was also certified by New York State as a Building Inspector, and certified in building codes, fire prevention, and "cause and origin." (*Id.* ¶¶ 178-79.)

The Village Fire Marshal is required to inspect buildings for fire hazards and make recommendations to correct unsafe conditions, report violations, perform compliance inspections, report repeated violations to the authorities, and investigate complaints of fire hazards. (Vill. 56.1 ¶¶ 180-82.) Poulos performed administrative investigations for Village Code violations. (Pl. Vill. 56.1 ¶ 180.)

In July 2005, Poulos, as Chief Fire Marshal, was responsible for inspecting building code violations, determining the cause and origin of fires, answering fire department complaints, and informing the fire department of fire hazards. (Vill. 56.1 ¶¶ 183-84.) The Village defendants contend that if firefighters find fire hazards or violations in a building, they report them to the Village Fire Marshal. (*Id.* ¶ 185.) Plaintiffs stated that: "Captain Welsh and defendant Chief Wagner testified that there is a chain of command [whereby firemen] report perceived concerns to the Captain, who is the senior officer inside, and then it is up to the Captain to report to the Chief. It is the Chief's call whether or not to inform the Fire Marshal." (Pl. Vill. 56.1 ¶ 185.) Nonetheless, Poulos did investigate complaints reported by the Fire Department, although, according to plaintiffs, those investigations were not always immediately performed. (Vill. 56.1 ¶ 186; Pl. Vill. 56.1 ¶ 186.) Poulos testified that he did not perform inspections based on the owner of the property; rather, the inspections he performed were completely random and performed at his discretion. (Vill. 56.1 ¶¶ 365-67, 369, 372.)

## H. Gucciardo's Complaints Regarding Apartment 2

Gucciardo did not like living at 21 Church Street; she testified that she wanted to break the lease with Mr. Mangino and move into a larger apartment because the apartment was too small for her to live in with her growing children. (Pl. Vill. 56.1 ¶¶ 211-12.) As a result, Gucciardo called David Knepp, an investigator for DSS, and requested that he inspect her apartment. (*Id.* ¶ 213.) On July 21,

2005, Gucciardo called the Village Housing Department regarding her apartment; specifically, she requested that the someone come check the power. (Pl. Vill. 56.1 ¶ 214.) Nudo answered Gucciardo's phone call to the Housing Department. (*Id.* ¶ 215.) According to the incident report from the phone call, Gucciardo stated that:

> she's having a problem with the landlord. He's allegedly made promises that have not been kept regarding repairs to her apartment. She said her windows don't remain in an open position, there are holes in her floor, her refrigerator malfunctions, she's experienced electrical problems and the basement has a large amt of debris. She's lived there with her 2 small children since Nov '04 and pays $950 per month. She fears the stated conditions will result in a fire.

(Vill. Defs.' Ex. RR, Gucciardo Incident Report 7-21-05.)[7] Gucciardo testified at her deposition that she wanted the Village to check the refrigerator because it was not cold enough from time to time and denied that she had called to report several items in the incident report. (Pl. Vill. 56.1 ¶ 219.)

After the phone call to the Housing Department, Gucciardo set up a Village Inspection for the same day that Knepp was scheduled to be at her apartment. (*Id.* ¶ 221.) According to Nudo's testimony, because the

Village Fire Marshal had to be alerted whenever there was a concern of fire, Nudo memorialized Gucciardo's complaint in an Inspection/ Incident Report and forwarded it to Poulos, as well as Mayor Pontieri and Commissioner McGiff. (*Id.* ¶ 223.)

On July 22, 2005, Gucciardo called the Village Housing Department to report that things were "getting fixed." (Vill. 56.1 ¶ 224.) Poulos was not at work on July 20, 21, 22 or 23 of 2005 (*id.* ¶ 225); thus, he was not present when Gucciardo called the Housing Department on July 21 or 22.

## I. Gucciardo's Alleged July 25, 2005 Report to Village Housing Department

On July 25, 2005, all eight apartments at 21 Church Street were occupied by tenants; Gucciardo still resided in Apartment 2. (*Id.* ¶¶ 227-28.)

On the morning of July 25, 2005, Poulos reported to work at the Village Building and Housing Department office. (*Id.* ¶ 229.) At this point, the parties present conflicting versions of the facts. According to the Village defendants, Gucciardo called the Village Housing Department to complain that the outlets in her apartment were sparking or arcing. (*Id.* ¶¶ 230-32.) The parties agree that a report of sparking or arcing outlets is considered an emergency. (Vill. 56.1 ¶ 234.) Gallo claims that she did not write down Gucciardo's complaint because Poulos was in the office that day. (Vill. 56.1 ¶ 236.) When Poulos arrived at the Village Building and Housing Department office, Gallo informed him that Gucciardo had complained about sparking outlets in her apartment. (*Id.* ¶ 237.) The Village defendants contend that Poulos considered Gucciardo's complaint an emergency, so he left immediately to go to 21

---

[7] According to Gucciardo's deposition, she does not recall saying that she feared the conditions would result in a fire. (Gucciardo Dep. at 132-33.) Plaintiffs insist that Gucciardo's primary purpose in calling the Village was to have someone check her refrigerator.

Church Street to investigate the situation. (*Id.* ¶ 238.)

According to plaintiffs, Gucciardo did not call the Village that morning, and the last time she had contacted the Village regarding her apartment was her call on July 22 to state that "things were getting fixed." (Pl. Vill. 56.1 ¶¶ 230-31.) Gucciardo denies making any call on July 25, 2005. (Gucciardo Dep. at 230-31.) Plaintiffs also point to the fact that it is the usual custom of the Village to document or keep records of all complaints made; accordingly, they argue that the lack of a record of Gucciardo's alleged call on July 25, 2005 establishes that there was no call. (*Id.* ¶ 230.) Plaintiffs argue that Gucciardo called the Village on July 21, 2005 to have them come check the power on her refrigerator and that she did not call to complain about other problems. (*Id.*)

Plaintiffs also have noted a number of alleged inconsistencies in defendants' evidence; plaintiffs contend these inconsistencies demonstrate that the alleged complaint on July 25, 2005 regarding "arcing or sparking wires" never occurred. Plaintiffs first note that the Village defendants' evidence demonstrates that Poulos did not arrive until after Gallo had completed the alleged call with Gucciardo. (Pl. Vill. 56.1 ¶ 236.) However, later in their statement of undisputed facts, plaintiffs assert that, according to Poulos's testimony, Gallo was still on the phone with Gucciardo at the time she advised Poulos of the alleged arcing or sparking wires. (*Id.* ¶ 237.) Plaintiffs also argue that Poulos testified that Kolb was physically present in the Village office when Poulos received the message about Gucciardo's complaint. (*Id.*) Poulos also testified that Giglio, who was at the counter with Kolb "yelled" the complaint about the

toilet bowl to Poulos as he was going out to the premises. (*Id.*) Giglio testified that Kolb was in the office making a complaint at the same time Gallo received the call from Gucciardo regarding "arcing or sparking" wires. (*Id.*) Plaintiffs argue that Kolb was only in the office making a complaint on July 22, 2005, and, thus, this call could not have occurred on July 25, 2005. (*Id.* ¶ 239.)

### J. Poulos's July 25, 2005 Arrival at 21 Church Street

The Village defendants contend that, upon receipt of Gucciardo's complaint, Poulos was concerned, so he left immediately to go to 21 Church Street to investigate. (Vill. 56.1 ¶ 239.) Plaintiffs argue that, had Poulos considered the situation a legitimate emergency, he would have called the Fire Department immediately. (Pl. Vill. 56.1 ¶ 239.) Poulos testified that he did not immediately call the Fire Department because he wanted to determine if the outlet was sparking or arcing before doing so. (*Id.*) He further testified that it took only minutes to drive to the premises and that, while en route to 21 Church Street, he called Mr. Mangino on his cell phone. (*Id.*; Vill. 56.1 ¶ 342.) Poulos arrived at the premises at approximately 11 a.m. (Vill. 56.1 ¶ 245.)[8]

---

[8] Plaintiffs emphasize that Gallo testified that, after she informed Poulos of Gucciardo's complaint, Poulos went to his desk and left the office in under one hour. (Pl. Vill. 56.1 ¶ 239.) Plaintiffs argue that it also took Poulos at least forty-five minutes after informing Mr. Mangino of the complaint to arrive at the premises, because Mr. Mangino's cell phone records indicate that the only incoming call he received that morning was at 10:11 a.m., and the drive to 21 Church Street from the Village office was only a few minutes. (*Id.*) On that call, Mr. Mangino testified that he informed Poulos that

Mr. Mangino was at 21 Church Street when Poulos arrived. (*Id.* ¶ 246.) Poulos told Mr. Mangino that he had come to check the outlet in Apartment 2. (*Id.* ¶ 248.) At some point before, during, or after his exchange with Poulos, Mr. Mangino called his lawyer, Edward Raskin ("Raskin"). (Pl. Vill. 56.1 ¶¶ 248-50.) Mr. Mangino refused to let Poulos in the house to check the outlet without a warrant. (Vill. 56.1 ¶ 251.) Plaintiffs contend that that Mr. Mangino put Poulos on the phone with Raskin, who told Poulos he could not enter the house without a warrant. (Pl. Vill. 56.1 ¶ 363.) Poulos called Nudo to request his assistance at 21 Church Street. (Vill. 56.1 ¶ 252.) Poulos informed Mr. Mangino that, if Mr. Mangino would not allow Poulos in, Poulos would call the Fire Department to investigate. (*Id.* ¶ 255.)

## K. The Search of 21 Church Street

At 11:01 a.m., because Mr. Mangino would not permit Poulos to enter the building, Poulos radioed the Village Fire Department with a code "Signal 13," which is an all-encompassing general alarm for a structure. (Pl. Vill. 56.1 ¶ 235; Vill. 56.1 ¶ 256.) The certified Dispatch Communications Sheet indicates a report of "wires burning in building." (Pl. Ex. 73, VP Ambulance Co. Call Sheet 7-25-05.) This type of alarm is considered an emergency that the Fire Department responds to as quickly as possible. (Pl. Vill. 56.1 ¶ 235.) The Fire Department received the alarm at 11:01 a.m. and arrived at 11:04 a.m. at 21 Church Street with four fire trucks, one fire rescue truck, and three other Fire Department vehicles. (*Id.* ¶ 256, 258, 259.)

Fire Chief Wagner arrived at the premises and asked Poulos what the problem was. (FD 56.1 ¶ 6.) Poulos explained that there had been a report of arcing or sparking outlets or wires and that the house was very old and had a previous fire. (*Id.* ¶ 7.) The parties dispute whether Mr. Mangino initially would allow the Fire Department to enter the building; however, Mr. Mangino ultimately permitted the Fire Department personnel to enter the premises. (Pl. Vill. 56.1 ¶ 268; FD 56.1 ¶¶ 8-10.) Wagner informed Mr. Mangino that, since the Fire Department received an emergency call, it was no longer Mr. Mangino's house until Wagner deemed it safe and that he was going to send firemen inside. (Pl. Vill. 56.1 ¶ 269.) Mr. Mangino agreed to allow only the firemen to enter the building, but Mr. Mangino would not allow Poulos inside the house. (Vill. 56.1 ¶¶ 273-74.) Wagner agreed with Mr. Mangino's request. (*Id.* ¶ 275.) Police officers and defendant Nudo also arrived at 21 Church Street. (*Id.* ¶¶ 277-78.)

Captain Welsh of the Patchogue Fire Department entered 21 Church Street with two to four firemen to look for an electrical problem or file. (Pl. Vill. 56.1 ¶ 281; Vill. 56.1 ¶ 281; FD 56.1 ¶ 13.) The firemen entered the house with thermal imaging cameras that allowed them to see through walls. (Vill. 56.1 ¶ 289.) Mr. Mangino entered the house with the firemen (*Id.* ¶ 282), while Wagner and Poulos remained outside. (*Id.* ¶ 284; FD 56.1 ¶ 14.) The Fire Department inspected the entire building, including the basement, because the main electrical service entered the building through the basement. (FD 56.1 ¶ 15.) Plaintiffs state that the fire personnel did not, however, evacuate any persons who may have been in the building. (Pl. FD 56.1 ¶ 15.)

____

there was no problem with the outlet or any other emergency requiring Poulos to come to the building. (Vill. 56.1 ¶¶ 242-43.)

The parties dispute whether the Fire Department entered Gucciardo's apartment because the door was open, because they received consent from Gucciardo, or because the firemen represented to Gucciardo that there was an emergency and "barged" in. (*Compare* Vill. 56.1 ¶ 291 *with* Pl. Vill. 56.1 ¶ 291.) Plaintiffs assert that Gucciardo "did not have [an] opportunity to object" to the Fire Department's entry. (Pl. Vill. 56.1 ¶ 292.) To the plaintiffs' knowledge, the firemen did not enter any other apartments. (*Id.* ¶ 293.) According to Welsh, the firemen checked Apartment 2 for outlet or wire problems. (*Id.* ¶ 294.) There was also testimony that they searched the walls with the thermal imaging camera to make sure that there was not a fire in the walls and checked the basement to make sure there was no fire or arcing wires. (*Id.* ¶¶ 294-95.)

Mr. Mangino escorted the firemen into the basement, where the firemen searched the basement walls with thermal imaging cameras and checked where the wiring and burner were located. (Pl. Vill. 56.1 ¶ 297.) The group entered the basement via the staircase that was accessible from within Apartment 2. (*Id.* ¶ 298.) Wagner testified that the firemen checked the basement because the main electrical conduit enters residential buildings through the basement. (*Id.* ¶ 299.)

The Fire Chief has authority to send a Fire Marshal into the building. (Vill. 56.1 ¶ 286.) According to Captain Welsh, he noticed two issues/ potential hazards while in the basement. (FD 56.1 ¶ 16; Pl. FD 56.1 ¶ 16; Vill. 56.1 ¶ 301.) Welsh radioed to Wagner from inside the premises. (FD 56.1 ¶ 17.) The parties dispute what Welsh told Wagner. (*Compare* FD 56.1 ¶ 18 *with* Pl. FD 56.1 ¶ 18.)

Captain Welsh and Fire Chief Wagner testified that there is a chain of command in the Fire Department. Specifically, firemen are responsible for reporting perceived concerns to the Captain, who is the senior officer inside. The Captain may then report the concerns to the Chief, who then has the discretion to decide whether to inform the Fire Marshal. (Pl. Vill. 56.1 ¶ 302.)[9]

Captain Welsh testified that he radioed Fire Chief Wagner from the basement. (Vill. 56.1 ¶ 303.) The parties dispute whether Captain Welsh reported the potential hazards to Fire Chief Wagner and whether any alleged hazards that existed were exigencies. (*Compare* Vill. 56.1 ¶ 304 *with* Pl. Vill. 56.1 ¶ 304.) Fire Chief Wagner does not recall firemen calling him regarding any hazards or dangers in the building, although he acknowledges that it is possible that they did. (Pl. FD 56.1 ¶ 22.) Fire Chief Wagner also does not recall whether he relayed the message regarding any potential hazards to Poulos, but stated that he "must have" because of the paperwork and because he was being deposed. (Pl. Vill. 56.1 ¶ 311.)

Poulos testified that he was standing next to Wagner when the radio call came in to request the Fire Marshal's assistance. (Pl. Vill. 56.1 ¶ 311.) Wagner testified it is possible that Poulos could have walked in without his knowledge, and Wagner did not remember asking Poulos to enter. (*Id.*) The Village defendants assert that Wagner invited Poulos in to the house to help investigate. (Vill. 56.1 ¶ 312.) The Fire Department thereafter turned the investigation over to Poulos. (*Id.* ¶ 313.)

---

[9] Plaintiffs note that Chief Wagner testified that in a non-emergent hazard situation, the Fire Marshal may address the problem, "at any point in time, whether it's five minutes, five hours, five days." (Wagner Dep. at 192-93.)

The scene was deemed clear at 11:35 a.m., and the Fire Department left. (*Id.* ¶ 314.)

## L. Fire Prevention Violation Order

Poulos entered 21 Church Street with three police officers and went into the basement where the firemen had noted potential hazards or violations. (Vill. 56.1 ¶ 317.) Mr. Mangino objected to Poulos's presence in the house but did not tell the police officers to leave. (*Id.* ¶¶ 318-19.) According to defendants, Captain Welsh and the firemen pointed out to Poulos the allegedly potential hazardous conditions regarding the electrical box, staircase stringer, and structural issues under the foundation area in the front of the building. (*Id.* ¶ 321.) Poulos wrote down his observations and issued a Fire Prevention Violation Order. (Pl. Vill. 56.1 ¶ 322.) Volunteer firemen, such as those present on July 25, 2005, may note violations or perceived unsafe conditions while on the scene of a fire investigation. (*Id.* ¶ 323; Vill. 56.1 ¶ 323.) The parties dispute the nature of the perceived unsafe conditions, the attendant exigent circumstances that accompanied the alleged conditions, and whether the conditions were of such a nature that the firemen were obligated to report their concerns to the Fire Marshal. (*E.g.*, Vill. 56.1 ¶¶ 326-27, 335-38, 340; Pl. Vill. 56.1 ¶¶ 326-27, 335-38, 340.) Captain Welsh and the firemen pointed out that the electrical box had open and exposed wiring, which, Captain Welsh testified, is considered an electrical or shock hazard. (Vill. 56.1 ¶ 332; Pl. Vill. 56.1 ¶ 332.) The parties also dispute whether Gucciardo remained in her apartment in order to point out additional violations to the Fire Marshal or Fire Department. (*Compare* Pl. Vill. 56.1 ¶¶ 343-45, 347 *with* Vill. 56.1 ¶¶ 343-45, 347.)

Poulos noted that the sprinkler system had to be re-certified, per an annual requirement by law. (Vill. 56.1 ¶ 341-42.) Poulos added Kolb's complaint regarding the toilet bowl to the Fire Prevention Violation Order because nobody had been able to investigate the complaint on the day it was made. (*Id.* ¶ 348.)

The Fire Prevention Order required plaintiffs to repair the hazardous conditions and/or supply the Village with a licensed engineer's report stating that no corrective action was necessary. (*Id.* ¶ 354.) The issues identified in the order had to be addressed by September 1, 2005 (*id.* ¶ 355), but Poulos gave plaintiffs an extension of time, until October 31, 2005, to resolve the issues. (*Id.* ¶ 356.) Although the Village defendants state that plaintiffs resolved the issues in the Fire Prevention Order to the satisfaction of Poulos, plaintiffs note that they nonetheless received thirty summonses in August 2005, as discussed *infra*. (*See* Vill. 56.1 ¶ 358; Pl. Vill. 56.1 ¶ 358-59.) Poulos himself never issued any summonses to plaintiffs. (Vill. 56.1 ¶ 361.)

## M. The Subsequent Tickets

Plaintiffs did not obtain a rental occupancy permit at any point between January 2005 and August 2005. (Pl. Vill. 56.1 ¶ 76.) Plaintiffs continued to rent out apartments at 21 Church Street during that time period. (*Id.* ¶ 77.)

Plaintiffs thereafter received appearance tickets for failure to apply for or secure a rental occupancy permit on the following dates: August 5, 2005, August 8, 2005, August 9, 2005,[10] August 11, 2005, August 12, 2005,

---

[10] Plaintiffs contend that there is evidence that summons 16518, issued on August 9, 2005, was written one day before the crime being alleged. (*See* Pl. Vill. 56.1 ¶ 89.)

August 13, 2005, August 14, 2005,[11] August 15, 2005, and August 16, 2005. (*Id.* ¶¶ 81, 85, 89, 93, 97, 101, 105, 109, 113.) These summonses were served on plaintiffs on August 27, 2005. During this time period, Mr. Mangino admitted that 21 Church Street did not have a valid rental permit but that plaintiffs continued to rent out apartments in the building. (*Id.* ¶¶ 102-03, 106, 110.)

On August 11, 2005, Nudo and Village Housing Coordinator Joanne Gallo went to 21 Church Street, allegedly to investigate Gucciardo's July 21, 2005 complaints. (*Id.* ¶ 384.) Nudo testified that he waited to investigate because Gucciardo had called to say that "things were getting fixed" and because he wanted to give plaintiffs time to resolve the issues. (Vill. 56.1 ¶¶ 385-86.) Plaintiffs note, however, that the Fire Prevention Order states that "start date will be August 1st, 2005," which gave plaintiffs thirty days—until August 31, 2005—to correct the violations. (Pl. Vill. 56.1 ¶ 387.)

Nudo told Gucciardo he would not enter 21 Church Street unless she signed an affidavit authorizing his entry. (Vill. 56.1 ¶ 392.) Gucciardo had allegedly already signed an affidavit authorizing Nudo to enter her apartment on July 25, 2005. (*Id.* ¶ 393; *see also* Pl. Ex. 83 Gucciardo Authorization for Entry 8-11-05.) However, plaintiffs note that this affidavit is dated and notarized August 11, 2005. (Pl. Vill. 56.1 ¶ 383.)[12]

DSS Inspector David Knepp was also present at the inspection at Gucciardo's request. (*Id.* ¶ 395.) Gucciardo pointed out issues with her apartment, including the floor. (Pl. Vill. 56.1 ¶ 396.) Knepp also performed an inspection of Apartment 2. (Vill. 56.1 ¶ 398.) Gucciardo insisted that the apartment was an unsafe place for her children to live; Gucciardo's intent was to get a larger place and stay on the SHARP program. (Pl. Vill. 56.1 ¶ 399.)

On August 11, 2005, Nudo issued plaintiffs an additional eighteen separate summonses for a variety of alleged violations of the Village Code. (Pl. Vill. 56.1 ¶ 93.) At oral argument, plaintiffs conceded that there was probable cause to issue these tickets. At his deposition testimony, when asked why he issued multiple summonses before serving the previous ones, Nudo acknowledged that he wanted to get Mr. Mangino's attention with the summonses. (Nudo Dep. at 196-97, 200, 203.)

All of the tickets issued to plaintiffs for violation of the Rental Permit Law were dismissed. (Vill. 56.1 ¶ 115.) Nudo did not appear in court to testify against plaintiffs for the summonses, allegedly because he lived in Arizona at the time. (Pl. Vill. 56.1 ¶ 470.) The parties dispute Nudo's purpose and intention in issuing plaintiffs multiple summonses for not having a rental permit. (*Compare* Vill. 56.1 ¶ 124 *with* Pl. Vill. 56.1 ¶ 124.) Nudo testified that he did not know that plaintiffs were

---

[11] Plaintiffs also contend that there is evidence that summons 16537, issued on August 14, 2005, was written one day before the date of the crime being alleged. (*See* Pl. Vill. 56.1 ¶ 105.)

[12] Technically the affidavit is notarized August 11, 2006, but there is reason to believe that the year is a mistake on the part of the notary, Joann

Gallo, whose notary authorization expired in April 2006, prior to August 11, 2006. Nonetheless, there still appears to be conflicting evidence regarding the date on which Gucciardo signed this authorization. The authorization is indeed dated August 11, 2005. However, at Gucciardo's deposition, her testimony suggested that she signed it on July 25, 2005. (*See* Gucciardo Dep. at 103-05, 145-46, 151-52.)

challenging the Rental Permit Law at the time he issued any of the tickets, but plaintiffs dispute this fact based upon, *inter alia*, the small size of the Village's government. (Pl. Vill. 56.1 ¶ 140.) Plaintiffs were never arrested or detained by the police as a result of the violations. (Vill. 56.1 ¶ 463.) The Village issued a warrant for the arrest of plaintiffs that resulted in them having to post bail (Pl. Ex. 88, Notice of Impending Warrants, 9-23-05), however, this warrant was issued for their failure to appear at their scheduled court appearances. (*Id.*)

### N. Nudo's Issuance of Tickets in the Village of Patchogue

The parties dispute whether Nudo's practice was to issue multiple summonses to every owner of a rental dwelling that continually failed to secure a rental occupancy permit. (*Compare* Vill. 56.1 ¶¶ 125-26 *with* Pl. Vill. 56.1 ¶¶ 125-26.) However, Mr. Mangino testified that he did not know any other individuals in the Village who failed to obtain a rental occupancy permit and did not receive a ticket. (Pl. Vill. 56.1 ¶ 127.) Mr. Mangino testified that he did not have any problems with Building Inspector Powell (Vill. 56.1 ¶ 128), but the parties dispute whether Powell issued tickets to plaintiffs of his own initiative or based upon explicit direction from Nudo. (*Compare* Pl. Vill. 56.1 ¶¶ 130-31 *with* Vill. 56.1 ¶¶ 130-31.)

The parties also dispute whether other landlords in the Village received summonses on consecutive days for not having a valid rental occupancy permit. (Compare Pl. Vill. 56.1 ¶ 132 *with* Vill. 56.1 ¶ 132.) Frank Giorgio was issued tickets on August 11, 2005 and August 13, 2005 for failing to secure a rental occupancy permit. (Vill. 56.1

¶ 133.)[13] The Passilaqua property was issued multiple subsequent tickets for exterior deterioration while their initial ticket was being contested in court. (Vill. 56.1 ¶ 134.)[14] The Hooghkirks were issued multiple subsequent tickets for misuse of single room occupancy while their initial ticket was being contested in court. (*Id.* ¶ 135.) The Deraos were also issued multiple tickets for failing to secure a rental occupancy permit, although these tickets were issued roughly one year apart. (*Id.* ¶ 136.) The Williams were issued multiple tickets for failure to secure a rental occupancy permit, among other violations. (*Id.* ¶ 137.) The Todisco property was also issued multiple tickets. (*Id.* ¶ 138.)

### II. PROCEDURAL HISTORY

Plaintiffs filed the complaint in this action on October 23, 2006. On January 17, 2007, plaintiffs filed an Amended Complaint. On March 16, 2007, defendants answered the Amended Complaint. On February 14, 2008, plaintiffs filed a Second Amended Complaint. Defendants answered this complaint on March 17, 2008.

On October 22, 2009, defendants requested a pre-motion conference in anticipation of filing a motion for summary judgment. The Fire Department defendants submitted their motion for summary judgment on February 16, 2010. The Village defendants submitted their

---

[13] Plaintiffs argue that these summonses were issued by different inspectors, and there is no evidence that Giorgio was contesting any previous summons on the same issue. (Pl. Vill. 56.1 ¶ 133.)

[14] Plaintiffs argue that it is noteworthy that the Passilaquas were not issued repetitive tickets on consecutive days in the same manner and frequency as plaintiffs were. (Pl. Vill. 56.1 ¶ 134.)

motion for summary judgment on February 19, 2010. Plaintiffs submitted their opposition on June 18, 2010. Defendants submitted their replies on August 20, 2010. The Court held oral argument on August 31, 2010. The Village defendants filed supplemental letters with the Court on September 3, 2010 and September 10, 2010, addressing additional issues raised at oral argument. Plaintiffs filed supplemental letters with the Court on September 7, 2010 and September 8, 2010. The Court has fully considered the submissions of the parties.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## IV. SECTION 1983 CLAIMS

As stated *supra*, plaintiffs bring their constitutional claims pursuant to § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v.*

*McCollan*, 443 U.S. 137, 145 n.3 (1979).[15] For claims under § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). Here, the parties do not dispute that all defendants were acting under color of state law. The question presented, therefore, is whether defendants' conduct deprived plaintiffs of the rights they assert under the First, Fourth, and Fourteenth Amendments. As set forth below, the Court grants the Fire Department defendants' motion for summary judgment in its entirety. The Court denies the Village defendants summary judgment with respect to plaintiffs' malicious abuse of process and unreasonable search claims under the Fourth Amendment, and to the municipal liability claims. The Court grants the Village defendants summary judgment with respect to plaintiffs' First Amendment, Fourteenth Amendment, and remaining Fourth Amendment claims.

## A. Fourth Amendment

Under the Fourth Amendment, plaintiffs assert claims for malicious prosecution, malicious abuse of process, and unreasonable warrantless search.[16] For the reasons set forth below, defendants' motions for summary judgment are granted with respect to the malicious prosecution claim and denied with respect to the malicious abuse of process claim. The Court grants the Fire Department defendants' motion for summary judgment on plaintiffs' claims against them relating to the alleged unlawful search of the house, but denies the Village defendants' motion for summary judgment with respect to the alleged unlawful search of the basement.

### 1. Malicious Prosecution

Plaintiffs assert claims for malicious prosecution against the Village defendants under § 1983 and under New York state law. For the reasons set forth below, the Village defendants' motion for summary judgment with respect to the malicious prosecution claims is granted.

"Claims for . . . malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for . . . malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citing *Conway v. Vill. of Mount Kisco*, 750

---

[15] Specifically, § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

---

[16] Plaintiffs' opposition to the instant motions does not address the Village defendants' motion to dismiss the false arrest claim and plaintiffs' counsel confirmed at oral argument that plaintiffs were withdrawing their false arrest claim.

F.2d 205, 214 (2d Cir. 1984)).[17] "'Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law . . . for such rules.'" *Alicea v. City of N.Y.*, No. 04-CV-1243 (RMB), 2005 WL 3071274, at *6 (S.D.N.Y. Nov. 15, 2005) (quoting *Conway*, 750 F.2d at 214). "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for [the defendants'] actions.'" *Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (quoting *Jocks*, 316 F.3d at 136) (internal quotation marks omitted). The Court addresses plaintiffs' § 1983 and state-law malicious prosecution claims in turn.

### a. Section 1983 Claim

Malicious prosecution claims under § 1983 require that there "'be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" *Conte v. Cnty. of Nassau*, 06-CV-4746 (JFB) (ETB), 2008 WL 905879, at *11 (E.D.N.Y. Mar. 31, 2008) (quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)). For this reason, plaintiffs' malicious prosecution claim under § 1983 must fail. The Second Circuit recently held that "the issuance of a pre-arraignment, non-felony summons

requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." *Burg v. Gosselin,* 591 F.3d 95, 98 (2d Cir. 2010). As in *Burg*, the tickets issued to plaintiffs did "no more than require [plaintiffs] to appear in court on a single occasion, and operate[d] to effectuate due process." *Id.* Plaintiffs were neither arrested nor detained as a direct result of these violations. (*See* Vill. Defs.' Ex. D at 77.)[18] Moreover, there were no restrictions on plaintiffs' travel. Plaintiffs contend that multiple court appearances were required of them—because they were issued multiple tickets. In *Albright v. Oliver*, 510 U.S. 266 (1994), Justice Ginsburg's concurrence noted that restrictive conditions of pretrial release on a "serious criminal charges," i.e., a felony charge, constitute a Fourth Amendment seizure." *Burg*, 591 F.3d at 97 (emphasis added) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)). However, the Second Circuit noted that "[t]he number of appearances may bear upon whether there was a seizure–though it is hard to see how multiple appearances required by a court, for the convenience of the person answering the summons, can be attributed to the conduct of the officer who issues it." *Id.* at 98. Here, because plaintiffs were issued separate summonses for their admitted continued non-compliance[19] with the

---

[17] As discussed *infra*, malicious prosecution claims under § 1983 also require that there be a seizure or other perversion of proper legal procedures.

[18] Although plaintiffs allege that an arrest warrant was issued and they were required to post bail, the Court notes that this occurred only after plaintiffs failed to appear in Court on the required return date.

[19] Plaintiffs do not contend that the tickets themselves were not warranted for their non-compliance with the rental permit statute. Instead, plaintiffs' arguments center around the number of tickets issued due to their non-compliance. However, the Court notes that, although multiple tickets were issued, the return date for all the tickets

rental permit statute, the Court concludes that under the circumstances of this case, plaintiffs have not identified a seizure implicating their personal liberty and privacy interests under the Fourth Amendment. *Cf. Corcoran v. Higgins*, No. 08 Civ. 10734 (HB), 2010 WL 1957231, at *4 (S.D.N.Y. May 13, 2010) ("Corcoran received summonses for two alleged misdemeanors, as shown on the face of the Uniform Traffic Tickets that she was issued. She was not subject to any other encumbrances on her liberty. Corcoran claims that she made 'multiple appearances' before the East Fishkill Town Court, but alleges nothing more to suggest that her repeated visits to the court, collectively, rose to the level of a Fourth Amendment seizure. Accordingly, Higgins's motion for summary judgment on the malicious prosecution claim is granted."); *Rotenberg v. Town of Mamaroneck*, No. 08 Civ. 4703 (JSR), 2010 WL 3468051, at *3 (S.D.N.Y. Aug. 24, 2010) ("[T]he Court concludes that requiring plaintiffs to appear in court twice in connection with the summons—for an initial appearance and a one-day trial—is not a sufficient deprivation of liberty to rise to the level of a constitutional injury."). Accordingly, plaintiffs are unable to bring a malicious prosecution claim based on the tickets issued for alleged violations of the Village Code. *See Manbeck v. Micka*, 640 F. Supp. 2d 351, 370 (S.D.N.Y. 2009) ("Here, in the criminal actions, Gennimi was merely issued appearance tickets to appear in Town Justice Court to answer misdemeanor charges of violations of the Town's Zoning Laws. There is no evidence in the record that she was ever physically detained in any way.

issued in August 2005 was identical—namely, September 21, 2005.

Likewise, there is no evidence that the civil proceedings commenced against Gennimi in Westchester County resulted in any 'seizure' sufficient to satisfy the constitutional element of a Section 1983 action. Thus, Gennimi's malicious prosecution claims under Section 1983 must be dismissed on this basis alone."); *Richardson v. N.Y. City Health & Hosps. Corp.*, No. 05 Civ. 6278 (RJS), 2009 WL 804096, at *15 (S.D.N.Y. Mar 25, 2009) ("[A] pre-arraignment summons does not constitute a seizure when evaluating a malicious prosecution claim[], and [a] § 1983 malicious prosecution claim requires more than a single court appearance to constitute a deprivation of liberty. . . . The single court appearance was not a Fourth Amendment 'seizure' caused by the initiation of criminal proceedings, and these events cannot support a constitutional claim for malicious prosecution." (collecting cases) (internal quotations omitted)); *Wang v. City of N.Y.*, Nos. 05 Civ. 4679 (AKH), 05 Civ. 5943 (AKH), 2008 WL 2600663, at *4 (S.D.N.Y. June 26, 2008) ("In order to show that the tort of malicious prosecution is also a § 1983, or constitutional violation, plaintiff must show some post-arraignment deprivation of liberty. . . . Plaintiffs also allege 43 malicious prosecution claims involving the issuances of summons returnable to the ECB and the NYC Criminal Courts. I hold that a pre-arraignment summons does not constitute a seizure when evaluating a malicious prosecution claims." (internal citations omitted)); *see also Bielanski v. Cnty. of Kane*, 550 F.3d 632, 642 (7th Cir. 2008) ("No court has held that a summons alone constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes. To hold otherwise would transform every traffic ticket and jury summons into a potential Section 1983 claim."); *Martinez v. Carr*, 479 F.3d 1292, 1299 (10th Cir. 2007) ("[T]he mere issuance of a citation requiring

presence at future legal proceedings does not qualify as a constitutional 'seizure' . . . ."); *DePiero v. City of Macedonia*, 180 F.3d 770, 789 (6th Cir.1999) ("Plaintiff cannot claim issuance of the traffic ticket effected a 'seizure' because upon appearing to answer the charges in the ticket, he would have been afforded a trial. On the date he was issued the parking ticket, he was 'free to leave.' As a result, plaintiff has no § 1983 claim against [the police officer] for issuance of the ticket.").[20] Accordingly, summary judgment is warranted in defendants' favor on the § 1983 malicious prosecution claim.

b. State Law Claim

Unlike federal law, a seizure is not required for a malicious prosecution claim under state law. However, as noted *supra*, under both state and federal law, a plaintiff asserting a malicious prosecution claim must demonstrate that the proceeding terminated in that plaintiff's favor. New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence. Instead, the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence. *See, e.g.*, *Cantalino v. Danner*, 754 N.E.2d 164, 168 (N.Y. 2001) ("[T]he question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused."). Under certain circumstances, a dismissal is considered to be a termination in a plaintiff's favor. For example, "the state's effective abandonment of a prosecution, [resulting] in a dismissal for violation of the accused's speedy trial rights, without an adjudication of his guilt or innocence, constitute[s] a favorable termination." *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) (citing *Murphy v. Lynn*, 118 F.3d 938, 949-50 (2d Cir. 1997)); *see also Smith-Hunter v. Harvey*, 734 N.E.2d 750, 753 (N.Y. 2000) (noting that a dismissal under New York Criminal Procedure Law § 30.30, based on New York's speedy trial statute, that is "sought and granted as a matter of statutory right based on the prosecutor's inaction" is a favorable termination in the absence of circumstances inconsistent with innocence); *see also Murphy*, 118 F.3d at 949-50 (approving New York cases holding that "failure to prosecute [or] failure to comply with speedy-trial requirements should be considered . . . a termination favorable to the accused").

In *Fulton v. Robinson*, 289 F.3d 188 (2d Cir. 2002), the Second Circuit "noted that the following outcomes were not considered sufficiently favorable to the accused to be indicative of innocence: dismissals for lack of subject matter jurisdiction, for failure to allege sufficient facts to support the charge . . . ; adjournments in contemplation of dismissal; and abandonment of prosecution that is the result of a compromise to which the accused agreed, an act of mercy requested or accepted by the accused or misconduct by the accused." *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 392-93 (S.D.N.Y. 2008). Moreover, the New York Court of Appeals has held that a termination is favorable only when "there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense." *Smith-Hunter*, 734 N.E.2d at 753.

Plaintiffs have not provided sufficient

---

[20] In any event, in the alternative, plaintiffs' § 1983 malicious prosecution claim should be dismissed because, as discussed *infra*, plaintiffs have failed to demonstrate "favorable termination" of the proceedings against them.

evidence that there was a favorable termination of the proceedings against them. Instead, they state, in conclusory fashion, that the tickets against them were dismissed. At oral argument, plaintiffs submitted a Village of Patchogue court opinion that dismissed the claims against Mr. Mangino pursuant to New York Criminal Procedure Law § 100.40 for failure to allege, with non-hearsay allegations, each and every element of the offense alleged. A dismissal for facial insufficiency is inadequate to constitute a favorable termination for the purposes of plaintiffs' malicious prosecution claim. *See Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("The charge subsequently was dismissed for facial insufficiency pursuant to section 170.30 of New York's Criminal Procedure Law. Because this was not a decision on the merits, an essential element of a cause of action for malicious prosecution, the district court did not err in dismissing Breen's claim of malicious prosecution."); *Bradley v. Vill. of Greenwood Lake*, 376 F. Supp. 2d 528, 534 (S.D.N.Y. 2005) ("In this case, the proceeding against Plaintiff for resisting arrest and obstructing governmental administration was not terminated in his favor because . . . the charges were dismissed due to insufficiency of the accusatory instruments."); *Mack v. Town of Wallkill*, 253 F. Supp. 2d 552, 562 (S.D.N.Y. 2003) ("Having dismissed the action on procedural grounds, Justice Freehill never reach the merits of the case, and plaintiff's innocence was not established by the dismissal. Therefore, for the purposes of maintaining an action for malicious prosecution, plaintiff's underlying criminal action cannot be said to have terminated in her favor." (citing *MacFawn v. Kresler*, 666 N.E.2d 1359 (N.Y. 1996) for the proposition that an "information dismissed on procedural grounds, namely that facts alleged by the

People were not legally sufficient to support the charge, did not terminate favorably to [defendant] and as such, [defendant] failed to state cause of action for malicious prosecution")); *Neal v. Fitzpatrick*, 250 F. Supp. 2d 153, 155 (E.D.N.Y. 2003) ("In fact, the New York Court of Appeals in *Smith-Hunter* explicitly affirmed [the holding in *MacFawn v. Kresler*, 666 N.E.2d 1359 (N.Y. 1996)] that a termination for facial insufficiency does not constitute a favorable termination.").[21] Plaintiffs contend that their termination was favorable because, although dismissed based on facial insufficiency, the charges could not thereafter be re-filed due to the statute of limitations. However, "[t]he mere lapsing of the statute of limitations does not establish a formal abandonment of charges and is therefore insufficient to demonstrate a final, favorable termination." *Neal*, 250 F. Supp. 2d at 156. Accordingly, plaintiffs' malicious prosecution claim fails under both state and federal law because there was no favorable termination as a matter of law.[22]

---

[21] The Court notes that the dismissal in *MacFawn* was a dismissal for facial insufficiency without prejudice—thus, the dismissal was not final, and the trial court's ruling was not a "final termination" for purposes of the malicious prosecution inquiry. However, as discussed *infra*, the lapsing of the statute of limitations is not sufficient to establish a favorable final termination in these instances.

[22] The Court notes that the malicious prosecution claim also fails because of the existence of probable cause with respect to each of the tickets. Plaintiffs conceded in their papers, and at oral argument, that probable cause existed for all but two of the tickets at issue. With respect to the remaining two, although plaintiffs concede that the violations existed on the dates in question, they speculate (based upon the ticket numbers) that the tickets were written prior to the dates of the violation and, thus, probable cause could not exist at the time

## 2. Malicious Abuse of Process

In order to demonstrate malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). A plaintiff may assert a malicious abuse of process claim where a defendant: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook*, 41 F.3d at 80).

The first element of a claim of malicious abuse of process requires that the defendant have employed regularly issued legal process to compel performance or forbearance of some act. Here, under the facts and circumstances of this case, the Court concludes that the issuance of repeated tickets is a process capable of being abused. *See TADCO Constr. Corp. v. Dormitory Auth. of N.Y.*, 700 F. Supp. 2d 253, 272 (E.D.N.Y. 2010).[23] Plaintiffs argue that

many of the tickets were issued on consecutive days and then served on plaintiffs all in one

---

[23] Specifically, in *TADCO*, the court stated:

It remains unclear whether New York law permits abuse of process claims "based on the issuance of the process itself," as opposed to some abuse of the process after it is issued. *Compare Webster v. City of N.Y.*, 333 F. Supp. 2d 184, 208 (S.D.N.Y. 2004) (suggesting issuance might be enough), with *Richardson v. N.Y. City Health & Hosps. Corp.*, 05-CV-6278, 2009 WL 804096, at *16 (S.D.N.Y. Mar. 25, 2009) (collecting Southern District of New York cases requiring further abuse of process after issuance); *Jones v. Maples*, 98-CV-7132, 2002 WL 287752, at *7 (S.D.N.Y. Feb. 26, 2002) (holding that "without an allegation that the process has been improperly perverted 'after' its issuance, a claim of abuse of process must be dismissed, even though the defendant acted maliciously in initiating the process"). The New York Court of Appeals, however, has noted in dicta that "nothing in this Court's holdings would seem to preclude an abuse of process claim based on the issuance of the process itself." *Parkin v. Cornell Univ., Inc.*, 583 N.E.2d 939, 943 (N.Y. 1991); *see also Mitchell v. Cnty. of Nassau*, 05-CV-4957, 2007 WL 1580068, at *12 (E.D.N.Y. 2007) (explaining that whether "the mere act of issuing process" fails to give rise to a claim of abuse of process "has been called into doubt by the New York Court of Appeals"). Recognizing the split of opinion on this issue and not foreclosing the possibility that defendants could later challenge DeMartino's § 1983 abuse of process claim on this ground should he choose to pursue it, at least at this stage, DeMartino will be considered to have plausibly alleged abuse of process in violation of his constitutional rights under § 1983.

*Id.*

those two tickets were written because the date did not occur yet. However, regardless of when the tickets were written, it is undisputed that the tickets were not filed and served until after the date in question and that probable cause existed at the time the ticket was filed and served. Thus, at the time the prosecution was initiated, probable cause existed as to those two tickets. Thus, defendants also are entitled to summary judgment on the malicious prosecution claim because of the existence of probable cause as a matter of law for each ticket.

batch, a couple of weeks after they were written, thus depriving plaintiffs of "the opportunity to remedy any one of the daily allegations of criminal conduct until there had already accumulated a number of violations." (Pl. Opp. at 35.)

To the extent that the Village defendants argue that the issuance of tickets to plaintiffs did not constitute regularly issued legal process, this argument is flawed. "'Appearance tickets' issued for the alleged commission of a misdemeanor may be deemed a process in light of section 215.58 of the Penal Law (L.1968, ch. 510, s 4), wherein a penalty is prescribed for failure to appear on the return date." *Farkas v. State*, 409 N.Y.S.2d 696, 698 n.3 (Ct. Cl. 1978); *see also Susser v. Fried*, 455 N.Y.S.2d 930, 933 (N.Y. City Civ. Ct. 1982) (collecting cases). This section does not apply to traffic infractions; however, here, the tickets issued to plaintiffs were not ordinary traffic tickets. The tickets issued to plaintiffs required a personal appearance. This is sufficient to constitute regularly issued process.

Finally, a claim of malicious abuse of process requires process be issued for a collateral objective outside the legitimate ends of process. In evaluating this element, the Second Circuit expressly distinguishes between a "malicious motive" and an "improper purpose"; only the latter suffices to meet the "collateral objective" prong of the abuse of process standard. *See Savino*, 331 F.3d at 77 ("In order to state a claim for abuse of process, a plaintiff must establish that the defendants had an improper purpose in instigating the action. . . . '[I]mproper motive is not enough.'" (quoting *Dean v. Kochendorfer*, 143 N.E. 229 (N.Y. 1924))); *see also Roeder v. Rogers*, 206 F. Supp. 2d 406, 414 (W.D.N.Y. 2002) (dismissing abuse

of process claim on summary judgment because "malicious motive, without more, does not give rise to [such] a cause of action" (citation and quotation marks omitted)); *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326-27 (N.Y. 1984) ("A malicious motive alone . . . does not give rise to a cause of action for abuse of process."). "Accordingly, to state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77.

Here, plaintiffs have alleged that defendants acted with an ulterior purpose in issuing the tickets. In particular, plaintiffs have submitted evidence that the Village prosecutor threatened plaintiffs that if they did not plead guilty and accept a plea deal for the tickets issued in January 2005 (which they were challenging in court, along with the constitutionality of the statute), they would be buried under a whole bunch of new charges. There remains a disputed issue of fact regarding whether the defendants attempted to get plaintiffs to discontinue their challenges to the Rental Permit Law by specifically warning plaintiffs' counsel, Raskin, that there would be new charges if plaintiffs did not relinquish their attempt to challenge the tickets and the constitutionality of the statute. (*See* Raskin Dep. at 132-33; *see also* Mangino Vill. 50-h Dec. 1, 2005, at 73-76.) Specifically, plaintiffs further argue that "the improper threat by the Village prosecutor in an effort to coerce plaintiffs from pursuing their right to defend themselves against the criminal prosecution commenced by the Village defendants is an abuse and violation of law." (Pl. Opp. at 36.)

The Village defendants argue that there was probable cause for the issuance of the tickets. Probable cause, as such, is not an element of the tort of abuse of process. *See Music Center S.N.C. v. Prestini Musical Instruments Corp.*, 874 F. Supp. 543, 556 (E.D.N.Y. 1995). Moreover, the existence of probable cause is not determinative of a claim of malicious abuse of process.[24] *See Lodges 743 and 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp.*, 534 F.2d 422, 465 n.85 (2d Cir. 1975) ("Since the Company unquestionably had probable cause to file a suit in this case, there is no allegation of malicious prosecution. Abuse of process, however, does not depend upon whether or not the action was brought without probable cause or upon the outcome of the litigation."); *VanZandt v. Fish & Wildlife Serv.*, 524 F. Supp. 2d 239, 247 (W.D.N.Y. 2007) ("[P]rocess properly issued on probably cause can nonetheless be abused.").[25] This is because "process properly issued on probable cause can nonetheless be abused." *VanZandt*, 524 F. Supp. 2d at 247.[26] The Second Circuit has stated that "'the gist of the tort' of abuse of process, [as] distinguished from malicious prosecution, 'is not commencing an action or causing process to issue without justification, but misusing or misapplying process *justified in itself* for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance.'" *Weiss v. Hunna*, 312 F.2d 711, 717 (2d Cir. 1963) (emphasis added) (citing Prosser, Torts, at 667-68 (2d ed. 1955)). Under the facts of this case, the Court determines that, even if probable cause existed to warrant the issuance of the tickets to plaintiffs, plaintiffs have put forward sufficient evidence to create a genuine issue of disputed fact as to whether defendants attempted to use this "process justified in itself" for an end other than that which it was designed to accomplish—namely, to pressure plaintiffs into ceasing their challenge to the constitutionality of the Rental Permit Law.

### 3. Warrantless Entry

#### a. Standing

The Village defendants argue that plaintiffs have no standing to bring a Fourth Amendment warrantless entry claim because they are

---

[24] At least one court has articulated the relevance of the probable cause inquiry in the context of an abuse of process claim as follows: "the absence of probable cause is probative of the lack of justification for the officers' actions and the existence of a collateral objective." *Phelps v. City of N.Y.*, No. 04 CIV. 8570 (DLC), 2006 WL 1749528, at *5 (S.D.N.Y. June 27, 2006).

[25] *But see, e.g., Hickey v. City of N.Y.*, No. 01 Civ. 6506 (GEL), 2004 WL 2724079, at *7 (S.D.N.Y. Nov. 29, 2004) (concluding that probable cause offers a complete defense to an abuse of process claim); *Granato v. City of N.Y.*, No. 98 Civ. 667, 1999 WL 1129611, at *7 (E.D.N.Y. Oct. 18, 1999) (probable cause an "excuse or justification" that defeats abuse of process claim).

[26] *But see Granato*, 1999 WL 1129611, at *7 ("[I]t is no less true under New York law that a showing of probable cause at the time process issued suffices also to establish 'excuse or justification' for the purposes of a defense to abuse of process."); *Berman v. Silver, Forrester & Schisano*, 549 N.Y.S.2d 125, 127 (App. Div. 1989) ("The plaintiffs have failed to demonstrate that the defendants intended to harm them by instituting the prior action. Rather, the defendants had probable cause to commence the prior action for specific performance.").

absentee landlords. The Court concludes that plaintiffs have put forward sufficient evidence to establish their standing to challenge the search of the basement of 21 Church Street, but not Gucciardo's apartment.

To have standing to object to an entry and search of a home under the Fourth Amendment, a plaintiff must show that he had a "'legitimate expectation of privacy'" in the place searched. *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable." *Id.* "A protected privacy interest has been found in a wide array of circumstances, ranging from ownership or regular occupancy of a home, to status as an overnight guest in someone else's home, or even in someone else's hotel room, to a rental storage unit, to one's business premises, including the desk drawers and file cabinets contained therein, as well as the contents of one's office computer." *Nieves v. N.Y. City Police Dep't*, No. 07 Civ. 5751 (SAS), 2010 WL 2010879, at *4 (S.D.N.Y. May 18, 2010).

The Village defendants argue that plaintiffs were "absentee landlords" of 21 Church Street and, therefore, have no standing to bring an unlawful search claim. Plaintiffs concede that they were absentee landlords of 21 Church Street. (Pl. Vill. 56.1 ¶ 5.) Plaintiffs argue, however, that they may claim standing to challenge the entry of 21 Church Street generally as landlords. A landlord generally does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant and

that is occupied by that tenant. *See, e.g.*, *Johnson v. Weaver*, 248 F. App'x 694, 697 (6th Cir. 2007) (concluding that state department of natural resources officers did not violate property owner's Fourth Amendment rights when they knocked on door of tenant's house, notwithstanding owner's prior order to officers to stay off his property, since the tenant lived there, and plaintiff's "ownership alone d[id] not create a reasonable expectation of privacy"); *Steinhauser v. City of St. Paul*, 595 F. Supp. 2d 987, 1006-07 (D. Minn. 2008) (landlords did not have reasonable expectation of privacy in their tenants' apartments, and therefore lacked standing to bring § 1983 claims based on searches of tenants' apartments), *rev'd in part on other grounds by Gallagher v. Magner*, Nos. 09-1209, 09-1528, 09-1579, 2010 WL 3419820 (8th Cir. Sept. 1, 2010); *United States v. Cruz*, 475 F. Supp. 2d 250, 257 (W.D.N.Y. 2007) ("Ownership of premises alone does not automatically confer standing"); *Dearmore v. City of Garland*, 400 F. Supp. 2d 894, 900 (N.D. Tex. 2005) ("[T]he property owner has no expectation of privacy if the property is leased.").

Plaintiffs argue that *Beatty v. Township of Elk*, Civil No. 08-2235 (RBK/JS), 2010 U.S. Dist. LEXIS 36673 (D.N.J. Apr. 14, 2010) provides support for their position that, as landlords, they have standing to challenge an unlawful search. *Beatty* asserted that certain factors may be examined in order to determine whether a landlord has standing to challenge a warrantless search of a tenant's property. Those factors include whether the landlord/owner had: (1) a proprietary or possessory interest in the property; (2) the right to exclude others; (3) taken precautions to maintain privacy; (4) exhibited a subjective expectation of privacy; or (5) been legitimately on the premises. *Id.* at *25-26. Other factors include whether the landlord had immediate

right to exclusive possession of the property, had a key to the property, lived in the property, kept personal clothing there, frequently used the property, and had permission to frequently use the property. *Id.* at *26-27. Plaintiffs, as landlords, own 21 Church Street. However, plaintiffs admit that they did not live at 21 Church Street; plaintiffs rent out eight units on the premises. (Mangino Aff. ¶ 2.) Plaintiffs have not presented evidence demonstrating that they possessed a reasonable expectation of privacy in the apartment units that they were leasing to tenants. First, aside from their conclusory assertions that they possessed a subjective expectation of privacy in their tenants' apartments, plaintiffs have provided no evidence that they, in fact, did have a subjective expectation of privacy there.[27] In *Beatty*, the court determined that the landlords' claims of standing to challenge an unlawful entry survived summary judgment because the landlords presented evidence that the alleged tenant "was a mere guest . . . which seems to infer the Beattys maintained a contemporaneous right of possession. Further, the Court's own review of the record reveals that perhaps the Beattys indeed maintained property at 535 8th Avenue, such that they had an expectation of privacy." *Beatty*, 2010 U.S. Dist. LEXIS 36673, at 27-28. In the instant case, plaintiffs acknowledge that they rented the apartments at 21 Church Street to tenants. They do not allege that the tenants were "mere guests," or that they maintained property in the tenants' apartments.

Nonetheless, even if plaintiffs lack standing to challenge the search of Gucciardo's apartment, they have presented sufficient evidence of standing with respect to the search of the basement. In particular, Mr. Mangino has submitted evidence that, at minimum, creates an issue of fact regarding whether he had a reasonable expectation of privacy in the basement area of 21 Church Street. Mr. Mangino submitted an affidavit that stated that he granted two tenants the right to access and use "specific areas of the basement of the premises for storage, in exchange for additional rent." (Mangino Aff. ¶ 2.) In the basement,

> there was a separate and private room which [Mr. Mangino] continuously had exclusive possession and sole use of. The door to this private room had a double pad lock, and [Mr. Mangino] was the only person that possessed a key to this room. [He] used the room in the basement for [his] own personal use. This room contained, amongst other things, DVR electronic security equipment for the premises, a monitor, desk and chair, tools, CD's, and personal papers. [He] had an expectation of privacy in [his] private room, and kept the door locked at all times to preserve [his] privacy as well as to secure [his] personal belongings.

(*Id.* ¶ 4; *see also* Pl. Vill. 56.1 ¶ 19.) Mr. Mangino contends that, on July 25, 2005, during the search of the premises by the Fire Department, he was ordered to unlock the door to his private room by the Fire Department.

---

[27] To the extent that plaintiffs present evidence of the lease agreements signed by their tenants, this does not indicate that plaintiffs had an expectation of *privacy* in those apartments, but rather indicates that plaintiffs had an immediate right to entry in emergency situations. A right of entry to or even occasional use of an apartment is not synonymous with an expectation of privacy. *United States v. Brown*, 596 F. Supp. 2d 611, 628-29 (E.D.N.Y. 2009).

(Mangino Aff. ¶ 5.) He further claims that this door was left open while various personnel were present on the premises, where the contents of the private room were in plain view to all, including Fire Marshall Poulos. (*Id.* ¶¶ 6-8; *see also* Mangino Vill. 50h at 45-48.) Because Mr. Mangino has presented evidence that he had not only a possessory right but also exclusive access to this room, which was kept double locked, plaintiffs have presented sufficient factual evidence from which a reasonable jury could conclude that he has standing to present his Fourth Amendment unlawful search claims. Thus, plaintiffs have demonstrated that Mr. Mangino has standing to challenge any unlawful entry and search of the basement at 21 Church Street.

### b. Unlawful Search

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *United States v. Elliot*, 50 F.3d 180, 185 (2d Cir. 1995) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

Even though defendant Poulos's search was administrative in nature, administrative searches cannot be made without the owner's consent unless a search warrant is first obtained. Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment. Under the Fourth Amendment, "one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property

without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Mun. Court of S.F.*, 387 U.S. 523, 528-29 (1965).

### (i) Exigent Circumstances

The Court first examines whether exigent circumstances justified the warrantless entry of the Fire Department defendants and Poulos into 21 Church Street. The Court determines that exigent circumstances warranted the Fire Department defendants' entry into the home but concludes that there are disputed issues of fact regarding whether exigent circumstances justified Poulos's subsequent entry into the house.

A warrantless search is permissible if exigent circumstances require state officials' immediate entry to the property. The Supreme Court has stated that

> the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized only a few such emergency conditions, *see, e.g.*, *United States v. Santana*, 427 U.S. 38, 42-43 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967) (same); *Schmerber v. California*, 384 U.S. 757, 770-71 (1966) (destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (ongoing fire), and has actually applied only the "hot pursuit" doctrine to arrests in the home, *see Santana*, *supra*.

*Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). A search may be reasonable under the emergency aid doctrine when officers

reasonably believe that it is necessary to protect the occupants of the residence from imminent injury. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." (citation omitted)).

### (a) Fire Department

The Supreme Court has held that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). Moreover, the right to warrantless entry following reports of a fire does not end immediately upon discovery of a fire. Instead, the Supreme Court noted:

> Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the

cause of a blaze after it has been extinguished. And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional.

*Id.* at 510.

Plaintiffs concede that defendant Poulos called the Fire Department on July 25, 2005 and requested its assistance for arcing or sparking outlet wires at 21 Church Street. (Pl. FD 56.1 ¶ 1.) Plaintiffs also concede that the Fire Department should be called for a complaint of sparking or arcing wires. (*Id.* ¶ 2.) Thereafter, the Fire Department received a structural fire alarm at 11:01 a.m. (*Id.* ¶ 3.) Fire trucks responded to the call, and the Fire Department arrived at 21 Church Street at 11:04 a.m. (*Id.* ¶¶ 4-5.) Upon the Fire Department's arrival, Poulos informed the Fire Department that there was a report of arcing wires and that the house was very old and had a previous fire. (*Id.* ¶¶ 6-7.) At that point, Mr. Mangino informed Wagner that he would only allow the firefighters to enter the house to resolve the problem, but that Poulos was not allowed in the house. (*Id.* ¶¶ 8-9.)[28] Wagner then explained to Mr. Mangino that, since the Fire Department received an emergency call, it had an obligation to investigate. (*Id.* ¶¶ 10-11.) Pursuant to Village of Patchogue Town Law § 170, emergency personnel are permitted and

---

[28] The Fire Department contends that Mr. Mangino told Wagner that he did not want anybody in the house and that he would not let the firemen inside. (FD 56.1 ¶ 9.) For the purposes of this analysis, the Court construes the facts favorably to the non-moving party, plaintiffs, and thus accepts plaintiffs' version of the exchange regarding permission to enter the premises.

authorized to enter premises when there has been an emergency call for such premises.

At that time, Wagner assigned firemen to go into the house to investigate. (*Id.* ¶ 12.) Captain Matthew Welsh of the Fire Department entered 21 Church Street with two to four firemen to inspect the premises. (*Id.* 56.1 ¶ 13.) Under these circumstances, the firefighters had an objectively reasonable basis for believing that there was a fire inside 21 Church Street. The Court notes that:

> [n]othing in the Fourth Amendment required [the firefighters] to wait until they saw actual smoke or flames to enter a building that they reasonably believed might be on fire. . . . Nor is it relevant that no fire or smoke was found. The objective standard for assessing reasonableness focuses on what the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe.
>
> [Moreover,] the Supreme Court has made clear that the subjective intent of government agents is irrelevant to determining whether a particular search was reasonable under the Fourth Amendment. . . . Rather, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'"

*United States v. Klump*, 536 F.3d 113, 118-19 (2d Cir. 2008) (internal citations omitted). In the instant case, the firemen inspected the entire building, including the basement. (Pl. FD 56.1 ¶ 15.) Furthermore, Poulos testified, and plaintiffs have not provided evidence to

refute, that firemen would normally investigate the staircase stringer and structural issues during a structural fire alarm for their own safety. (*Id.* ¶ 29; FD 56.1 ¶ 29.) To the extent that plaintiffs contend that a search of the basement was not justified, the Court concludes that such a search was reasonable under the circumstances. *See Klump*, 536 F.3d at 119 ("[Defendant] asserts that the firefighters and agents had no reason to search the first and second floors of the warehouse because the burning smell appeared to originate from the top of the building. He contends that the firefighters and agents should have proceeded directly to the third floor and, having found no fire or smoke there, immediately left the warehouse. We disagree. Under the totality of the circumstances, the firefighters acted reasonably in searching all three floors to locate the source of the burning smell and determine whether the warehouse was on fire.").

The record supports the contention that the Fire Department defendants' actions were for the purpose of securing safety.[29] Upon arriving at 21 Church Street, responding to reports of sparking or arcing outlets, the Fire Department was permitted to enter without a warrant to inspect the premises in order to determine the location of any alleged fire or perceived fire danger. Even once the Fire Department defendants had determined that there was no fire, once in the building, Fire Department officials were permitted to lawfully remain there for a reasonable time to investigate the cause of the alleged dangers at the premises. *See Tyler*, 436 U.S. at 510-11. Accordingly, the Court concludes that the Fire Department defendants' entry of 21 Church Street was

---

[29] In fact, plaintiffs' counsel conceded at oral argument that the Fire Department's entry of the building was appropriate.

justified by exigent circumstances and grants them summary judgment on plaintiffs' Fourth Amendment unlawful entry claim.

### (b) Village Defendants

The Village defendants contend that exigent circumstances existed that also justified Poulos's entry into 21 Church Street. For the reasons set forth below, the Court concludes that issues of disputed fact exist, which precludes summary judgment on whether an emergency still existed at the time of Poulos's subsequent entry.

"A warrantless inspection of a private dwelling by a municipal administrative officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances. . . . However, searches pursuant to a regulatory scheme need not adhere to the usual requirements where special governmental needs are present." *Shapiro v. City of Glen Cove*, No. CV 03-0280 (WDW), 2005 WL 1076292, at *13 (E.D.N.Y. May 5, 2005) (citing *Palmieri v. Lynch*, 392 F.3d 73, 79-80 (2d Cir. 2004) (internal citations and quotation marks omitted)). "The circumstances in which a warrantless search of a private dwelling is deemed constitutional are narrow and specific," but "[w]arrantless searches have regularly been allowed when they were conducted pursuant to some legislated regulatory scheme in situations in which there was found to exist a diminished expectation of privacy." *Palmieri*, 392 F.3d at 79-80 & n.3. Here, there is a disputed issue of fact regarding whether exigent circumstances existed that required Poulos to inspect the building site for serious violations.

The Village defendants first contend that

exigent circumstances were created based upon Gucciardo's call to the Village Housing Department. On July 21, 2005, Gucciardo called the Village Housing Department regarding her apartment. (Vill. Defs.' 56.1 ¶ 214; Pl. Vill. 56.1 ¶ 214.) Defendant Nudo took the call from Gucciardo and created an Incident Report as a result of this call. (Pl. 56.1 ¶¶ 214-15.) Plaintiffs and the Village defendants dispute the nature of Gucciardo's call. The Village defendants argue that Gucciardo was calling to make a "complaint" regarding her apartment (Vill. Defs.' 56.1 ¶¶ 214-16), whereas plaintiffs argue that Gucciardo was merely calling to have the power checked (Pl. 56.1 ¶ 214). Specifically, the incident report associated with Gucciardo's call stated:

> The undersigned Village of Patchogue Housing Inspector received a call on this date from a Dawn Gucciardo. She stated she's a tenant in Unit #2 at 21 Church Street in the Village of Patchogue. Ms. Gucciardo stated she's having a problem with her landlord. He's allegedly made promises that have not been kept regarding repairs to her apartment. She said her windows don't remain in an open position, there are holes in her floor, her refrigerator malfunctions, she's experienced electrical problems and the basement has a large amt of debris. She's lived there with her 2 small children since Nov '04 and pays $950 per month. She fears the stated conditions will result in a fire.

(Pl. Ex. 67, Gucciardo Incident Report 7-21-05 with 7-22-05 note.) There was evidence that on July 22, 2005, Gucciardo called the Village back and "stated that things are getting fixed." (*See id.*; *see also, e.g.*, Giglio Dep. at 74.)

28

Gucciardo testified that Nudo came on July 22 and checked the outlet. (Gucciardo Dep. at 125, 128-29, 135-37.)

Poulos testified, however, that, on July 25, 2005, he was "informed of sparking wires in an apartment at the Village office, the girl was – a tenant was on the phone and she wanted someone over there right away. That's when I went right over to determine what the problem was." (Poulos Dep. at 211.) Thus, Poulos claims that Gucciardo called the Village on the morning of July 25 to complain about the arcing or sparking wires in her apartment. (*See id.* at 211-13.)[30] Gucciardo testified that, on the morning of July 25, 2005, she did not call the Fire Department, did not call the Suffolk County Police Department, did not call for an ambulance, and did not call the Village of Patchogue. (Gucciardo Dep. at 230-31.) The Village defendants have failed to present any evidence establishing that a call or complaint regarding Gucciardo's apartment was made to the Village on July 25, which is notable, because it is the usual custom and practice of the Village to document and/or keep records of complaints made. (*See* Gallo Dep. at 17-19, 20-22, 58; Giglio Dep. at 55-57, 65, 71; Pontieri Dep. at 298; Poulos Dep. at 217; Nudo Dep. at 105, 114.) Plaintiffs have presented evidence from which a reasonable jury could conclude that Poulos called the Fire Department on the morning of July 25, 2005 to gain access to 21 Church Street to

inspect for code violations and not due to immediate concerns about an imminent fire in Gucciardo's apartment.

The Village defendants argue, in the alternative, that even if exigent circumstances did not exist to justify Poulos's entry of 21 Church Street prior to the Fire Department's arrival on July 25, 2005, exigent circumstances existed after the Fire Department entered the home. In particular, the Village defendants contend that Poulos entered the building because the firemen inside observed potential electrical and structural hazards and asked Fire Chief Wagner to send the Fire Marshal inside to inspect it. (Vill. Defs.' Mem. of Law at 17 (citing Ex. I at 102-03; Ex. LL at 272).) However, plaintiffs have presented evidence from which a reasonable jury could conclude that there were no exigent circumstances necessitating Poulos's entry into the building at that time. At the deposition of Fire Chief Wagner, he testified:

Q: If there were a hazard, would you have noted it, put it that way?

A: If there was a major hazard, it would have been noted.

Q: Is there a difference between major and minor hazards?

A: Sure there is.

* * *

Q: So a non-imminent hazard may not necessarily be noted; is that what you're trying to say?

A: Yes.

* * *

---

[30] Poulos also testified that at the time he was informed of Gucciardo's call, Kolb was physically present in the office registering a complaint about her toilet bowl. (Poulos Dep. at 287-89.) The only evidence that there was a call from Gucciardo at a time when Kolb was present was on July 22, 2005. (*See* Pl. Ex. 67, Gucciardo Incident Report 7-21-05 with 7-22-05-note.)

Q: There were apparently, according to documentation, some kind of complaint about stairs. That day, did any of the fire personnel going up or down the steps have any problems with the steps?

* * *

A: Don't remember.

(Wagner Dep. at 173-75.) Wagner also did not recall if he instructed Poulos to enter the premises and, if so, the reason that he called Poulos in:

Q: In this particular instance, it was referred over to the fire marshal, are we able to, as we sit here today, determine for what reasons you referred it to the fire marshal?

* * *

A: I don't recollect what the exact cause was for turning it over to the fire marshal.

Q: Do you have any records that indicate, in fashion, what any of the causes or cause of the fire were?

A: No, I don't.

Q: If there were some causes that were significant, would they have been noted in this fire report?

* * *

A: It's possible.

Q: When you say "it's possible,"

under what circumstances would it be reported and what circumstances would it not?

* * *

A: Again, if there was an imminent problem, I would expect it to have been put down in a document.

(Wagner Dep. at 205-07.) Matthew Welsh, a firefighter who was present on July 25, 2005, stated:

Q: The whole time you were in there from the time you arrived at the premises until the time you signed the sheet, you didn't find any flames?

A: No flame.

Q: You didn't find any smoldering?

A: No.

Q: Didn't see any smoke?

A: No.

Q: No sparking or arcing wires?

A: No.

Q: Nothing in the walls either you or your men may have noticed that was hot or any kind of urgent situation? When I say hot, I mean temperature-wise?

A: Right, no.

Q: Did you see anything that would cause immediate cause of fire, meaning something imminently about to

combust?

A: No.

(Welsh Dep. at 169.)[31]  Thus, plaintiffs have

presented factual evidence from which a reasonable jury could find that there were no exigent circumstances justifying Poulos's entry of the apartment.  Thus, there is a disputed issue of fact regarding whether exigent circumstances that warranted Poulos's warrantless entry of 21 Church Street arose once the Fire Department arrived and inspected the building on the morning of July 25, 2005.

### (ii) Consent

The Court next examines whether Poulos had consent to enter 21 Church Street, including the basement, without a warrant.  If Poulos had consent to enter the premises, his warrantless entry was justified even if exigent circumstances did not exist.  The Court determines that it is undisputed that Poulos did not have Mr. Mangino's consent to enter the building and that there are disputed issues of fact regarding whether (1) Gucciardo had actual or apparent authority to consent to a search of 21 Church Street; and (2) if so, and if she did provide consent, whether that consent was voluntary.

"To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, one jealously and carefully drawn exception recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (quotations and citations omitted); *accord United States v. Matlock*, 415 U.S. 164,

---

[31] At oral argument, the Village Defendants argued that there was testimony that Welsh informed Wagner of issues with 21 Church Street that required Poulos's attention.  Specifically, Welsh testified as follows:

Q: When you say you report items that you had seen, at least two items that you recall.  That being the wiring and the bricks supporting some kind of structure, correct?

A: Correct.

Q: Tell me about who you reported to and when.

A: I just passed it on to the chief and ask him if he wants to call the fire marshal.

* * *

Q: Do you recall what you told him specifically?

A: Just – I probably told him about the two violations and that he might want to have the fire marshal take a look at it.  Something along those lines.

Q: Did you ask him to call the fire marshal in right then and there or did you ask any other instruction?

* * *

A: Usually if he is around and see if he can respond.

(Welsh Dep. at 159-60.)  However, this does not conclusively demonstrate the urgency or

exigency of the situation, nor does it conclusively demonstrate that Wagner did, in fact, radio to Poulos regarding these items.  It is possible that there were code violations on the premises that were not exigencies.  Moreover, as mentioned *supra*, Wagner testified that he did not recall what he told the Fire Marshal.

171 (1974); *Koch v. Town of Brattleboro*, 287 F.3d 162, 167 (2d Cir. 2002) ("A search conducted pursuant to consent by an authorized third party does not require probable cause or a warrant." (citing *Matlock*, 415 U.S. at 171 n.7). Depending on the circumstances, "[t]hat person might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent." *Randolph*, 547 U.S. at 109 (citing *Schneckloth*, 412 U.S. at 222 and *Matlock*, 415 U.S. at 170).

(a) Mr. Mangino's Consent

Although the Village defendants move for summary judgment on this claim, there remain issues of fact that preclude this claim from being resolved by way of summary judgment. In particular, although it is undisputed that Mr. Mangino allowed the Fire Department to enter the residence without a warrant, he specifically did not allow Poulos to enter the residence. (Pl. FD 56.1 ¶ 9; *see also* Poulos Dep. at 229.) Poulos, as conceded at oral argument by the Village Defendants, was not a member of the Fire Department, as the Fire Marshal is not affiliated with the Fire Department, but rather is an official employed by the Village of Patchogue. Mr. Mangino's consent for the Fire Department to enter was not a broad consent for the Fire Marshal, Poulos, to enter as well. "The standard for measuring the scope of [an individual's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *see also United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005). Here, a reasonable person would not have understood Mr. Mangino's consent to include a consent for Poulos to enter, since it is undisputed that Mr. Mangino refused Poulos's entry and expressly agreed that the Fire Department could enter, but Poulos could not.[32]

_____

[32] The Court recognizes that, although an individual may "delimit as he chooses the scope of the search to which he consent[ed]," *Jimeno*, 500 U.S. at 252, several courts have found that consent to search may not be qualified by the number of officers allowed to search. See *United States v. Rubio*, 727 F.2d 786, 797-97 (9th Cir. 1983); *United States v. Betts*, 16 F.3d 748, 755 (7th Cir. 1994); *State v. Benallie*, 570 N.W.2d 236 (S.D. 1997); *see also Wildauer v. Frederick Cnty.*, 993 F.2d 369, 372 (4th Cir. 1993). The closest case that the Court could find on point in support of the Village defendants' argument was *Hoffman v. County. of Delaware*, 41 F. Supp. 2d 195 (N.D.N.Y. 1999). In that case, the court concluded that an individual's consent to search could not be delimited to exclude an officer from a different agency. Specifically, the *Hoffman* court stated:

The fact that Hamilton was a member of a different police department than Lewis or was acting in his position as Special Investigator for the County Department of Social Services Lewis does not require a different result. For example, *Rubio* involved "a group of local, state and federal officers." *Id.* at 796. The Ninth Circuit did not find the involvement of federal, state, and local police agencies to be determinative of the defendant's expectation of privacy. Similarly, in *Wildauer*, the plaintiff consented only to the entry of an employee of the department of social services into her home. Nevertheless, members of the sheriff's department, who had accompanied the social worker to the plaintiff's home, also entered. The Fourth Circuit, in agreeing with the Ninth Circuit, stated that "once a person consents to the search . . . he may not qualify the number of officials allowed

Mr. Mangino, the owner of the premises,

to search. Having consented to [the social worker's] entry, [plaintiff] could not deny access to other members of the party." *Wildauer*, 993 F.2d at 372. Here, Hoffman knew that Hamilton, the Department of Social Services, and the County Sheriff were involved in his case. Thus, having given consent to Officer Lewis to enter his residence, he no longer had any expectation of privacy and could not limit that consent to exclude Hamilton.

Similarly, whether Hoffman specifically told Hamilton not to enter the apartment without a warrant does not alter the Court's conclusion. The only case to arguably support Hoffman's position is *Mickelson v. State*, 906 P.2d 1020 (Wyo. 1995). In *Mickelson*, the police obtained consent upon their promise that only one officer would enter the premises. *Mickelson* gave his consent upon the express condition that only that one officer enter the premises. Notwithstanding this promise, another officer entered the premises. The *Mickelson* court disagreed with the above-cited federal cases and held that an individual could limit consent to a certain number of officers. *Mickelson*, 906 P.2d at 1022-23.

*Mickelson* is distinguishable from the instant case because, here, Hoffman's consent was not induced upon a promise that only one officer would enter the apartment.

*Hoffman*, 41 F. Supp. 2d at 214-15. *Hoffman* is distinguishable because, as discussed extensively *supra*, Mr. Mangino's consent was induced upon a promise that only the Fire Department could enter the apartment and no reasonable person could have understood Mr. Mangino's consent to include consent to Poulos entering the house.

refused consent for Poulos to enter. Thus, there was no consent by Mr. Mangino for Poulos to enter 21 Church Street.

### (b) Gucciardo's Consent

The Village Defendants argue that Gucciardo's consent was sufficient to justify Poulos's entry into the building, including the basement. However, the Court finds that, on the issue of Gucciardo's consent, there are clear issues of fact that preclude summary judgment. Specifically, the Court concludes that there are disputed issues of fact regarding the following issues: (1) if Gucciardo had actual or apparent authority to consent to a search of 21 Church Street (including the entire basement area); (2) whether she did consent to the search; and (3) if so, whether her consent was voluntary.

### (1) Authority to Consent

"The law in this circuit is well settled that a third party's consent will validate a search of places or items in which another maintains a privacy interest if two conditions are satisfied: the third party had (1) 'access to the area searched,' and (2) either '(a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access [to the area].'" *United States v. Snype*, 441 F.3d 119, 136 (2d Cir. 2006) (quoting *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 53 (2d Cir. 2003)). The consent of one who possesses common authority over the premises is valid as against absent, nonconsenting persons with whom the authority is shared. *Matlock*, 415 U.S. at 170.[33]

---

[33] In 2006, the Supreme Court held that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).

"Thus, in any third party consent case, the issue to be resolved is whether the consenting party possessed a sufficient relationship to the searched premises to validate the search. Mutual use of property, or joint access or control of property, is generally sufficient." *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988) (citations omitted).

However, even if a third party "lacks *actual* authority to consent to a search of a particular area, he still may have apparent authority to consent to the search." *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir. 2007). Apparent authority to give consent "must be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). Thus, even if the person giving consent in fact lacked authority to do so, the consent is still valid if the person had apparent authority to consent, *i.e.*, "the person reasonably appeared to the police to possess authority to consent to the search." *United States v. Cicuto*, No. 10 Cr. 138 (PAC), 2010 WL 3119471, at *5 (S.D.N.Y. Aug. 6, 2010) (quoting *United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009)).

There is undisputed evidence that Mr. Mangino "granted approximately two tenants the right to access and use specific areas of the basement of the premises for storage, in exchange for additional rent." (Mangino Aff. ¶ 2.) There was also a staircase to the basement from within Gucciardo's apartment. (*See* Mangino Vill. 50-h at 45 ("Q: There's a way to get to the basement from Apartment 2? A: Yes.").) However, there is also evidence that Mr. Mangino kept a "separate and private room" in the basement, over which he "continuously had exclusive possession and sole use of." (Mangino Aff. ¶ 4.) He kept the door to this room locked at all times, and defendants have presented no evidence suggesting that any other individual had access to, or control over, this area. (*See id.*) Mr. Mangino further stated that "[o]n July 25, 2005, [he] was ordered, over [his] objection, to unlock the locked door" to this room, by the Fire Department. (*Id.* ¶ 5.) Mr. Mangino asserts that, once the door was unlocked and

---

Under *Randolph*, even assuming that Gucciardo's consent was voluntarily given and that Gucciardo could consent to a search of the common areas of the basement that she used for storage, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him. *Randolph*, 547 U.S. at 106. Mr. Mangino was present at 21 Church Street on July 25, 2005. The Village defendants concede that Mr. Mangino refused entry to the building to Poulos. Under *Randolph*, because the Court determines that Mr. Mangino has survived summary judgment on his claims of standing with respect to the basement—both the common area and the private locked area—even if Gucciardo did consent to a search of this area, her consent would not be valid over Mr. Mangino's refusal to consent. Of course, the fact that the *Randolph* decision was decided in 2006, which was after the search in this case in 2005, creates an issue with respect to qualified immunity. However, the Court need not address that issue because, as discussed in detail *infra*, even assuming *arguendo* that *Randolph* would not apply and the police could rely on Gucciardo's consent regarding the basement even if Mangino withheld consent, there are still disputed issues of fact regarding whether Gucciardo did consent and, if so, whether the consent was voluntary, that preclude summary judgment on the unlawful entry claim, including on the issue of qualified immunity.

the door was open, Poulos entered the premises over his objection and entered the basement to conduct an inspection. (*Id.* ¶ 8.) As a result, Poulos allegedly was able to view the contents of Mr. Mangino's private room. Therefore, plaintiffs have created a genuine issue of disputed fact as to whether Gucciardo had actual or apparent authority to consent to a search of the entire basement area, including Mr. Mangino's private basement room at 21 Church Street.[34]

### (2) Voluntariness of Consent

Even assuming Gucciardo did have actual or apparent authority to consent to a search of the basement areas, a consent to a warrantless search must be freely and voluntarily given in order to be valid. *Schneckloth*, 412 U.S. at 222 (citations and internal quotations omitted). Voluntariness is determined by an examination of the totality of the circumstances. *Id.* at 227-28. Some of the factors that should be considered in determining whether consent was voluntary are, *inter alia*: (1) the consenting party's knowledge of his right to refuse consent; (2) whether the police used subtly coercive police questioning to elicit the consent; (3) the possibly vulnerable state of the consenting party; (4) the number of police officers on the scene; (5) whether the consenting party was under arrest and whether the arrest was effected through forcible entry, use of force, or display of weaponry. *See United States v. Orozco*, No. 89-CR-934, 1990 WL 118287, at *6 (E.D.N.Y. Aug. 3, 1990) (citing *Schneckloth*, 412 U.S. at 227-29).

On July 25, 2005, when the Fire Department arrived at 21 Church Street, defendant Nudo was also present. Gucciardo testified that Nudo asked Gucciardo to sign a form that was an affidavit authorizing entry into the dwelling. (Gucciardo Dep. at 103-04.) However, there is conflicting evidence regarding when this authorization was actually signed. Notably, the authorization itself is dated August 11, 2005 and notarized August 11, 2006.[35] (*See* Pl. Ex. 83, Gucciardo Authorization for Entry 8-11-05.) Moreover, the Village defendants did not argue, in their papers or at oral argument, that this consent formed the basis for Poulos's authorization to enter the premises.

Gucciardo testified that she signed the authorization when there were "over 100 personnel, ambulances, fire trucks, police cars," present at the premises. (Gucciardo Dep. at 104.) Gucciardo testified at her deposition that Nudo "came over and said, 'Please, we need you to sign this.'" (*Id.*) Although Gucciardo initially testified that she read the document before she signed it and did

---

[34] It is worth noting that Poulos testified that his entry was based upon the invitation to enter from the Fire Department; Poulos did not testify that he entered based on Gucciardo's consent. (*See, e.g.*, Poulos Dep. at 272-73 ("A: I was going down at the request to go down. Q: Did Fire Chief Joseph Wagner then instruct you to go down? . . . A: I think, yes. He indicated go ahead because I think I asked him. . . . He told me to go down and I said to the effect, 'Are you sure you want me to go in?'").) However, as noted *supra*, there are disputed issues of fact regarding whether the Fire Department asked Poulos to enter the basement to assist in an exigent situation or whether Poulos entered simply entered to inspect the building for non-exigent violations.

[35] Presumably, the "2006" year of the notarization is a mistake, as the document also notes that Joann Gallo's, the notary's, commission expires on April 30, 2006, which would be prior to the date of notarization, if that date were August 11, 2006.

not have a problem signing it (*id.* at 105), she revised her testimony and stated that "I changed my thought there. I still don't understand why this whole thing happened. I open my door and the whole brigade was out there." (*Id.*) Gucciardo testified that she was concerned and frightened when she signed the consent form:

> I could not see an inch of grass on my lawn that's how I thought there was a five alarm fire somewhere. That's how many personnel were there. Three fire trucks came. One blocked the end of the street with a siren. One blocked one end of Church Street and one truck was in the rear of the house blocking the rear entrance. There had to be two, three, four ambulances. I don't know how many cop cars. All the fire chiefs – their cars were all out front. I opened the door and the fire department came through with axes in hand, full gear, marched straight through the apartment and went right down in the basement. . . . That's when Mr. Nudo came over. I know the lady was present and they asked me to sign that form.

(*Id.* at 145-46; *see also id.* at 146-49.) She further stated that she thought that the presence of the Fire Department and other officials meant that there was an emergency on the premises. (*Id.* at 151-52 ("Q: Did you think there was an emergency? A: Of course, with them all coming through the house like that. Q: You thought there was an emergency? A: Common sense, yes.").) She further testified that "[t]here was no permission asked to get in the house [by the Fire Department]," on July 25, 2005. (*Id.* at 161; *see also id.* at 225-26 ("Q: 'These firemen were carrying axes, but they did not show me any warrants.' Is that an accurate statement? A: Yes. Q: The next sentence says, 'They pushed past me into my apartment and then went downstairs into the basement.' Is that generally what we were just discussing? A: Yes. Q: So is that an accurate statement? A: Yes.").)

Voluntariness is a factual inquiry determined by reference to the totality of the circumstances, and "[a]ccount must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *United States v. Guzman*, No. 09 Crim. 0656 (LAK), 2010 WL 2802298, at *4 (S.D.N.Y. July 14, 2010). In particular, in cases, where "'the police misrepresentation of purpose is so extreme,'" such as representation of an emergency situation that requires their entry to a home, a person is "'deprive[d] . . . of the ability to make a fair assessment of the need to surrender his privacy,'" and therefore the resulting "'consent should not be considered valid.'" *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 288 (S.D.N.Y. 2008) (quoting Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (3d ed. 2007)). The Court concludes that the disputed evidence contains issues of fact regarding whether Gucciardo consented to the search of her apartment and, if she did, whether that consent to search the premises was voluntarily given. *See United States v. Giraldo*, 743 F. Supp. 152, 153-54 (E.D.N.Y. 1990) (concluding that, when agents disguised as gas company workers asked permission to enter to check for a gas leak, the resulting consent was involuntary because the "defendant was led to believe there was a life-threatening emergency," and that consent to search was required to prevent an impending disaster); *United States v. Tibbs*, 49 F. Supp. 2d 47, 52-54 (D. Mass. 1999) (concluding that the

"lateness of hour" and large number of officers invalidated consent as coerced); *Djonbalic v. City of N.Y.*, No. 99 CIV. 11398 (SHS) (AJP), 2000 WL 1146631, at *10 (S.D.N.Y. Aug. 14, 2000) (concluding that, "[i]n this case, a reasonable jury could find that the facts and circumstances surrounding entry into plaintiffs' three apartments vitiated consent," based upon evidence of "the late hour at which the police knocked on the doors of people with poor command of the English language, the fact that the police were in riot gear carrying weapons, the officers' threat to use force and the fact that the police began breaking down the Djonbalics' doors"); *People v. Jefferson*, 350 N.Y.S.2d 3, 4 (App. Div. 1973) (excluding evidence in plain view where police gained entry by identifying themselves as police but claiming to be investigating a gas leak). Accordingly, even assuming that Gucciardo did have authority to consent to a search of the basement of 21 Church Street, there remain disputed issues of fact regarding whether Gucciardo consented to the search and, if so, whether any alleged consent provided by Gucciardo was voluntary. Thus, the Village defendants' motion for summary judgment with respect to the Fourth Amendment unlawful search claims, based upon the purported consent of Gucciardo, is denied.

### c. Damages

The Village defendants argue that plaintiffs cannot succeed on their claim because they have not suffered any actual damages as a result of Poulos's entry. "Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation," and related damages. *Townes v. City of N.Y.*, 176 F.3d 138, 148 (2d Cir. 1999). Therefore, nominal damages are clearly available to plaintiffs if they can prove that a Fourth Amendment violation occurred. Under Second Circuit law, even if there were no actual damages resulting from any unconstitutional search, plaintiffs are entitled to a trial even if they are only able to recover slight or nominal damages. *Id.* at 145; *see also Gonzalez v. City of Schenectady*, No. 00-CV0824, 2001 WL 1217224, at *9 (N.D.N.Y. Sept. 17, 2001) (noting that where plaintiff sought damages for alleged invasion of privacy before marijuana discovered, "[w]hether a jury would award compensatory damages for the brief detention suffered by the Plaintiff is . . . a question of fact"). Accordingly, the Village defendants' damages argument is relevant only to the level of damages to which plaintiffs may be entitled and does not provide grounds for summary judgment.

### B. First Amendment

Plaintiffs argue that the Village improperly threatened plaintiffs—specifically, plaintiffs contend that they were told that they should accept a plea offer or else the Village would issue additional summonses as retaliation for the pursuit of plaintiffs' legal claims. As set forth below, the Court concludes that plaintiffs' First Amendment claim cannot withstand summary judgment.

The elements of a First Amendment retaliation claim are dependent on the "factual context" of the case. *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). In the context of a private citizen's action against public officials, the plaintiff must show that: "(1) [the plaintiff] has an interest protected by the First Amendment; (2) defendants' actions

were motivated or substantially caused by [a plaintiff's] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [plaintiff's] First Amendment right."[36] *Old St. George's LLC v. Bianco*, No. 09-2017-cv, 2010 WL 2982961, at *2 (2d Cir. July 30, 2010) (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).[37]

Plaintiffs have adequately demonstrated an interest protected by the First Amendment: their right to petition the government for the redress of grievances, as explicitly afforded by the First Amendment. This includes the right to use the legal/judicial process to seek redress for wrongs—specifically, challenging the tickets issued to them in January 2005 under the rental permit law. *See, e.g.*, *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment." (collecting cases)); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (same); *see also United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n.*, 389 U.S. 217, 222 (1967) (right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected . . . with the other First Amendment rights of free speech and free press").

Moreover, plaintiffs have put forth sufficient evidence to raise a triable issue of fact regarding whether defendants' actions were motivated or substantially caused by plaintiffs' exercise of their right. Plaintiffs rely on more than generalized allegations of malice. *See Kerman v. City of N.Y.*, 261 F.3d 229, 242 (2d Cir. 2001). Here, specifically, plaintiffs assert that the Village threatened that, if plaintiffs did not cease their challenge to the constitutionality of the Rental Permit Law, plaintiffs would be charged with additional violations. (*See, e.g.*, Raskin Dep. at 132-33; *see also* Mangino Vill. 50-h Dec. 1, 2005, at 73-76.) Fourteen of the thirty tickets issued to the Manginos in August 2005 were for rental permit violations. (*See* Pl. Exs. 28-57.)

In order to meet the third element, or the

---

[36] Plaintiffs argue, and the Court notes, that the Second Circuit has described the elements of a First Amendment retaliation claim differently in different contexts: "We have described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). The Court concludes that the elements set forth in *Curley* are those most applicable to the instant claim. *See Williams*, 535 F.3d at 76 (*comparing Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (requiring a private citizen who sued a public official to show: "(1) [the plaintiff] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right"), *with Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (requiring evidence of "adverse employment action" where plaintiff was a public employee), and *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (requiring, in the prison context, an adverse action by defendants and a causal connection between the adverse action and the protected speech)).

[37] The Village defendants argue, and plaintiffs dispute, that a plaintiff must plead and prove the absence of probable cause as an element of a First Amendment retaliation claim. The Court need not reach the probable cause inquiry because plaintiffs have failed to demonstrate chilled speech as part of their prima facie claim of First Amendment retaliation.

chilling requirement, a plaintiff must come forward with evidence showing either that (1) defendants "silenced" him or (2) defendants' actions had some "actual, non-speculative chilling effect" on his speech. *Columbo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002). In particular, "[t]he Supreme Court has held that 'allegations of a subjective chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Curley*, 268 F.3d at 73. (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). In *Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001), the Second Circuit stated that:

> [a] plaintiff must show, with respect to the third element, that his First Amendment rights were "actually chilled." *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978). The Supreme Court has held that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). In the case at bar, despite plaintiff's charge that he was arrested in retaliation for his comments made during the 1993 mayoral campaign, he continued his 1994 campaign for village trustee even after the arrest and ran again for village public office in 1995. Although plaintiff insists that his 1995 campaign was affected by his arrest—namely, that it was demoralized and only amounted to a token effort—the fact remains that Curley chose to run for public office even after the events of August 1994. Where a party can show no change in his behavior, he has quite plainly

shown no chilling of his First Amendment right to free speech. *See Singer*, 63 F.3d at 120 (finding no chilling effect where, after an arrest, the plaintiff continued to publish his newspaper through which he criticized the village government); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chilling effect where, after the filing of a lawsuit, the plaintiff continued to write criticizing editorials in the same manner as before the lawsuit).

*Curley*, 268 F.3d at 73. Thus, "[t]he allegation of a chill is indispensable for private plaintiffs." *Ford v. Reynolds*, 167 F. App'x 248, 250 (2d Cir. 2006) (citing *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005)); *see also Old St. George's LLC*, 2010 WL 2982961, at *2 (affirming dismissal of a First Amendment retaliation claim when "the complaint alleges no 'actual chill' in DeChiaro's speech caused by appellee's alleged actions"); *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (same). Accordingly, this Court must "conduct an inquiry into whether plaintiff[s'] speech was actually chilled by the retaliatory conduct." *Saleh v. City of N.Y.*, No. 06-CV-1007, 2007 WL 4437167, at *3 (S.D.N.Y. Dec. 17, 2007). Actual chilling must be established by "a change in behavior" because "a subjective chill cannot serve as a substitute for a specific objective harm." *Aretakis v. Durivage*, No. 07-CV-1273, 2009 WL 249781, at *21 (N.D.N.Y. Feb. 3, 2009) (citing *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)); *accord Curley*, 286 F.3d at 73.

Here, plaintiffs make no argument that their behavior was altered as a result of the Village defendants' alleged actions. They do not state that they dismissed their lawsuit regarding the

constitutionality of the rental permit law, nor do they argue that they thereafter obtained a rental permit or forewent contesting the tickets in court. Without evidence of such an actual chill, the undisputed evidence indicates that plaintiffs' conduct was not, in fact, chilled by defendants' alleged retaliatory conduct. Accordingly, plaintiffs' First Amendment claim must fail, and the Village defendants' motion to dismiss this claim is granted.

C. Fourteenth Amendment Claims

1. Procedural Due Process

Plaintiffs argue that, because they have put forward sufficient evidence supporting their claim for malicious abuse of process, that they have similarly stated a claim for denial of procedural due process. The Court disagrees.

In order to assert a violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation omitted). In order to establish a procedural due process violation, a plaintiff must prove that he or she was deprived of "'an opportunity . . . granted at a meaningful time and in a meaningful manner' for [a] hearing appropriate to the nature of the case." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971).

To support their claim of denial of procedural due process, plaintiffs rely upon the same factual basis upon which they rely

to support their malicious abuse of process claim. Specifically, they argue that "[i]n the criminal context, malicious abuse of process is by definition a denial of procedural due process . . . ." (Pl. Mem. of Law at 36 (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).) Thus, plaintiffs argue, they have presented sufficient evidence for their procedural due process claim to survive summary judgment. However, plaintiffs' due process claim cannot be predicated upon the same factual basis as plaintiffs' Fourth Amendment malicious abuse of process claim. *See, e.g.*, *Rockland Vending Corp. v. Creen*, No. 07-CV-6268 (KMK), 2009 WL 2407658, at *4 (S.D.N.Y. Aug. 4, 2009) ("Gallagher's failure to establish an issue of material fact as to whether he was actually confined negates his claim of a deprivation of liberty for due process purposes; moreover, a due process claim relying on the same facts as a false imprisonment claim cannot be sustained even if confinement could be shown."); *Farag v. United States*, 587 F. Supp. 2d 436, 450 n.22 (E.D.N.Y. 2008) ("In addition to alleging that Smith and Plunkett violated Plaintiffs' Fourth Amendment rights, plaintiffs added that the agents' actions also violated their Fifth Amendment right 'not to be denied their liberty without due process of law.' However, plaintiffs' Fourth Amendment and Fifth Amendment due-process claims are both premised on the same factual allegations of false arrest and false imprisonment. Consequently, the Fourth Amendment's specific guarantee of freedom from unreasonable seizures, not the Fifth Amendment's general guarantee of due process, provides the appropriate framework of analysis." (citing *Gerstein v. Pugh*, 420 U.S. 103, 125 n. 27 (1975) ("The Fourth Amendment was tailored explicitly for the criminal justice system, and it[ ] . . . always has been thought to define the 'process that is due'

for seizures of person or property in criminal cases. . . .'"))); *Hall v. Brown*, 489 F. Supp. 2d 166, 174-75 (N.D.N.Y. 2007) ("Any deprivation of Plaintiff's liberty in this case would be encompassed in her claim for False Arrest . . . . Moreover, it is no help to Plaintiff that the same claim is asserted again here under the Fourteenth Amendment as opposed to the Fourth Amendment. . . . Therefore, Plaintiff's claim that she was deprived of liberty without due process of law, being duplicative of her false imprisonment claim, cannot stand."); *Jovanovic v. City of N.Y.*, No. 04 Civ. 8437 (PAC), 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) ("If Plaintiff is able to provide additional facts to support his abuse of process claim, then he will have adequately alleged the violation of his constitutional right to be free from malicious abuse of process, as guaranteed by the Fourteenth Amendment's procedural due process clause.").[38] In the *Cook* case, on which plaintiffs rely, the Second Circuit was discussing whether a malicious abuse of process claim could be asserted under § 1983. *Cook*, 41 F.3d at 80. The Circuit concluded that malicious abuse of process was a cognizable federal claim under § 1983, and affirmed the district court's denial of summary judgment on that plaintiff's malicious abuse of process claim. *Id.* at 80-81; *see also Azzam v. Travelers Ins. Co.*, No. 97-CV-1041 (FJS) (GJD), 2000 WL 151906, at *3 n.11 (N.D.N.Y. Jan. 28, 2000) ("The Second Circuit has held that abuse of criminal process is actionable under § 1983."

(citing *Cook*, 41 F.3d at 80)).[39]

Accordingly, because plaintiffs assert their procedural due process claim upon the same factual basis as their malicious abuse of process claim, this claim must fail. The Fourth Amendment's guarantee of freedom from unreasonable seizures thus provides the appropriate framework of analysis for plaintiffs' claim. As discussed *supra*, plaintiffs' malicious abuse of process claim withstands defendants' motion for summary judgment, and plaintiffs may assert their claims regarding the issuance of the summonses to plaintiffs on that ground. Thus, defendants' motion for summary judgment on plaintiffs' procedural due process claim is granted.

2. Substantive Due Process

Plaintiffs also assert a substantive due process claim based upon the Village defendants' alleged attempt to threaten plaintiffs into dismissing their lawsuit challenging the January 2005 tickets. The Court determines that plaintiffs' substantive due process claim is duplicative of their malicious abuse of process claim and grants defendants' summary judgment on the substantive due process claim.

---

[38] At least one court has merged the two claims, characterizing the claim as a "due process claim based on abuse of process." *See Jones v. J.C. Penney's Dep't Stores, Inc.*, No. 03-CV-920A, 2007 WL 1577758, at *14-15 (W.D.N.Y. May 31, 2007).

[39] The Court acknowledges that there is authority within the Second Circuit that a claim for violation of the right to a fair trial may coexist with a Fourth Amendment claim, such as a claim for false arrest or malicious prosecution. However, a "claim under § 1983 for violation of the right to a fair trial lies where a police officer 'creates false information likely to influence a jury's decision and forwards that information to prosecutors.'" *Brandon v. City of N.Y.*, No. 07 Civ. 8789 (LAP), 2010 WL 1375207, at *12 (S.D.N.Y. Mar. 30, 2010) (quoting *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). Plaintiffs do not assert such a claim here.

As the Second Circuit has explained, "[t]he touchstone of due process is protection of the individual against arbitrary action of government." In particular, the Fourteenth Amendment affords "[s]ubstantive due-process rights . . . against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999).

As with the procedural due process claim, the substance of plaintiffs' substantive due process claim is based on the same factual predicate as plaintiffs' abuse of process claim. The Court concludes, as discussed *supra*, that plaintiffs have presented sufficient evidence to withstand summary judgment with respect to their abuse of process claim. Accordingly, plaintiffs' claim relating to the issuance of the summonses falls under the Fourth Amendment's protection against the abuse of process. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Thus, "[i]t would be a waste of resources to permit these claims under the Fourteenth Amendment, as well as improper, given the Supreme Court's direction that substantive due process analysis is not available where a more specific constitutional standard is directly applicable." *Hickey v. City of N.Y.*, No. 01 Civ. 6506 (GEL), 2004 WL 2724079, at *18 (S.D.N.Y. Nov. 29, 2004); *see also Simons v. New York*, 472 F. Supp. 2d 253, 265

(N.D.N.Y. 2007) ("In this case, the government actions which plaintiffs contend was arbitrary and egregious, as well as the harm it allegedly caused, are very closely intertwined with Mr. Simons's arrest and prosecution. Since the Fourth Amendment provides an explicit textual source of protection against pretrial deprivations of liberty, including false arrest and malicious prosecution, it is the proper guide for analyzing plaintiffs' constitutional claims, not the Fourteenth Amendment. Therefore, defendants' motion for summary judgment on plaintiffs' substantive due process claim will be granted."). The Court recognizes that a general due process claim is appropriate where a more specific source of protection is absent or open to question. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (finding substantive due process analysis was appropriate where Fourth Amendment did not apply to high speed police chase). However, in this instance, plaintiffs' claim of abuse of process falls squarely within the protections of the Fourth Amendment. Accordingly, a substantive due process analysis is inappropriate, and the Court grants defendants' motion for summary judgment on plaintiffs' substantive due process claim.[40]

_____

[40] In any event, to meet the first prong of the test for substantive due process violations, a plaintiff must show that he has a "valid property interest." *Cine SK8 v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007) (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001)). Plaintiffs have failed to articulate a valid property interest—aside from their Fourth Amendment rights—that was infringed by the Village defendants' actions, and this Court is unable to conclude which interests plaintiffs would assert in this context. *Cf. Maybee v. Town of Newfield*, 789 F. Supp. 86, 88-91 (N.D.N.Y. 1992) (noting, under a case with a similar factual basis, that when plaintiffs contended "that the actions of the Town Code Enforcement Officer, Mr. Hughes, in issuing

### 3. Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Here, plaintiffs bring claims pursuant to the Equal Protection Clause under two different theories: "selective enforcement" and "class of one." As the Court sets forth below, because plaintiffs are unable to demonstrate that they were treated differently than similarly situated individuals, the Court grants defendants summary judgment on plaintiffs' equal protection claims.[41]

---

appearance tickets to plaintiffs for their failure to abide by the MHP Law [were] arbitrary and capricious and an abuse of process in violation of their procedural and substantive due process rights," plaintiffs claimed to have two constitutionally protected property interests: "(1) a vested nonconforming use and (2) a property interest in issuance of a variance from the MHP Law's licensing requirements"). Plaintiffs allege no such property interests here. Thus, for this additional reason, summary judgment in favor of defendants with respect to plaintiffs' substantive due process claim is warranted.

[41] "While the Second Circuit has not resolved the question of whether there truly is a distinction between selective enforcement and class of one equal protection theories, courts in this circuit have repeatedly treated them as distinct theories with distinct elements of proof and have accordingly evaluated them as separate claims." *Bonenfant v. Kewer*, No. 3:05cv01508, 2007 U.S. Dist. LEXIS 64104, at *24 (D. Conn. Aug. 30, 2007) (collecting cases). The Court, therefore, has evaluated plaintiffs' class of one and selective enforcement claims separately.

### a. Selective Enforcement

#### (i) Legal Standard

The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)). As set forth below, however, and as the Second Circuit held in *Cine SK8*, it is well settled that plaintiffs must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment. *Cine SK8*, 507 F.3d at 790.

First, plaintiff must demonstrate that he "was treated differently from other similarly situated [individuals]." *Id.* (citations and quotation marks omitted); *see also Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) ("A selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated."). In particular, at the summary judgment stage, a "plaintiff must present evidence comparing [himself] to individuals that are 'similarly situated in all material respects.'" *Sebold v. City of Middletown*, No. 3:05-CV-1205, 2007 U.S. Dist. LEXIS 70081, at *81 (D. Conn. Sept. 21, 2007) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Further, the Second Circuit has held that, to the extent a municipality is selectively enforcing land use restrictions, a plaintiff would be "hard pressed" to demonstrate selective treatment without also demonstrating the municipality's knowledge of the other, unenforced violations. *See LaTrieste Rest. v.*

*Vill. of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999); *see, e.g.*, *Zavatsky v. Anderson*, No. 3:00cv844, 2004 U.S. Dist. LEXIS 7440, at *23-29 (D. Conn. Mar. 8, 2004) (denying summary judgment where material issues of fact remained as to defendant's knowledge of similarly situated individuals treated differently from plaintiff). However, the Second Circuit also stated:

> We do not hold that knowledge will be required in every case. It is conceivable that selective treatment could be shown where, for example, proof was offered that a municipality did not know of prior violations because it adhered to a see-no-evil policy of not enforcing an ordinance, and then abandoned that policy with respect to a violator engaged in protected activity.

*LaTrieste*, 188 F.3d at 70 n.1.

### (ii) Application

Based on the undisputed facts of this case, the Court concludes that no rational jury could find that plaintiff has satisfied the first prong of a similarly situated equal protection claim. The Village defendants have presented evidence that Nudo issued multiple summonses for failure to obtain a rental occupancy permit to other rental property owners that rented out their property without first obtaining a rental occupancy permit. (*See* Vill. Defs.' Ex. M. at 97-98, 206.) Other property owners in the Village received summonses on consecutive days for code violations. (*See* Vill Defs.' Ex. H at 101-02; Vil. Defs.' Ex. K at 167, 179; Vill. Defs.' Ex. N at 99-101.) Moreover, the Passilaquas and Hooghkirks were issued tickets while challenging prior tickets in court. (Vill. Defs.' Ex. K at 166, 177-79; Vill. Defs.' Ex. L at 150-51; Vill. Defs.' Ex. N at 101.)

In their opposition, to attempt to show that similarly situated individuals were treated differently, plaintiffs submitted affidavits from Rocco Todisco, Celia R. Durao, and Angelo Passalacqua. These individuals' affidavits stated that, to the best of their recollections, "none of the summonses issued by the Village of Patchogue were repetitive of any other summonses issued during the calendar year" to him. (*See* Todisco Aff.; Durao Aff.; Passalacqua Aff.) In his affidavit, Passalacqua acknowledged that he has had approximately seventy or more summonses issued to him by the Village of Patchogue for alleged violations since 1997, if not earlier. Sixteen of those tickets were repetitive of previously issued tickets and were issued by Nudo. Those tickets were issued approximately one month apart. (Passalacqua Aff.) Passalacqua further states that, in 1997, he received two tickets on consecutive days for the same alleged violation but that they were issued by a different enforcement officer other than Nudo. (*Id.*) Moreover, plaintiffs present evidence that a review of all of the tickets issued by Powell and Nudo for the year 2005 does not indicate the issuance of any repetitive tickets with as great a scope and frequency as that issued to plaintiffs. (*See* Pl. Ex. 62 A-D; Pl. Ex. 63 A-C.) Nonetheless, in their reply, the Village defendants submit evidence of tickets issued to other landlords in the Village of Patchogue. Their submissions indicate that Frank DiGiorgio, owner of a property at 45 Rider Avenue, received summonses for not having a rental permit on August 10, 2005, August 11, 2005, and August 13, 2005. (Vill. Defs.' Ex. DDDD.) Eugenia Carr, landlord of 26 Baker Street, received five summonses on June 1, 2005, and four summonses on August 16,

2005. (Vill. Defs.' Ex. EEEE.) Defendants also present evidence of husbands and wives receiving individual summonses for the same violations. Ricardo Durao received nine summonses, for violations, including the lack of a rental permit on February 9, 2005. His wife, Cecilia Durao, received nine summonses, including for lack of a rental permit, on the same date. Thus, the Duraos received eighteen summonses on one day, issued by defendant Nudo. (Vill. Defs.' Ex. FFFF.) David Rosenberg, landlord of 44 Terry Street, received 12 summonses in one day, including for lack of a rental permit, on January 29, 2005. (*Id.*)

Plaintiffs' evidence misses the mark. To make it past the summary judgment stage on a selective enforcement equal protection claim, it is plaintiffs' burden to demonstrate similarly situated individuals who were treated differently. Here, plaintiffs' burden is to demonstrate that other residents who were issued tickets for, *e.g.*, lack of a rental permit, continued to not comply with the law at issue, *e.g.*, the rental permit law, but did not receive subsequent summonses for their continued non-compliance. Plaintiffs have failed to do so. Mr. Mangino even testified that he did not know any other individuals in the Village who failed to obtain a rental occupancy permit but did not receive a ticket. (Pl. Vill. 56.1 ¶ 127.) Accordingly, plaintiffs' selective enforcement claim must fail, and summary judgment for defendants is granted on this claim.

### b. "Class of One"

In *Prestopnik v. Whelan*, the Second Circuit explained the difference between "class of one" equal protection claims and more traditional equal protection claims:

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). While this clause "is most commonly used to bring claims alleging discrimination based on membership in a protected class," it may also be used to bring a "class of one" equal protection claim. *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In a "class of one" case, the plaintiff uses "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff . . . to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Neilson*, 409 F.3d at 105.

249 F. App'x 210, 212-13 (2d Cir. 2007); *see also King v. N.Y. State Div. of Parole*, 260 F. App'x 375, 379 (2d Cir. 2008) ("In [*Olech*], the Supreme Court recognized the viability of an Equal Protection claim 'where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." (quoting *Olech*, 528 U.S. at 564)). In particular, as the Court sets forth below, in order to prevail on a class of one claim, a plaintiff must demonstrate that (1) he was treated differently from a similarly situated individual; (2) the differential treatment was arbitrary and irrational; and (3) the treatment was not based on a discretionary or subjective decision.

First, in order to prevail on a class of one claim,

> the plaintiff "must demonstrate that [[h]e was] treated differently than someone who is prima facie identical in all relevant respects." *Neilson* [*v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)] (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). This requires a showing that the level of similarity between the plaintiff and the person(s) with whom she compares herself is "extremely high"—so high (1) that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy," and (2) that "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson*, 409 F.3d at 104-05.

*Prestopnik*, 249 F. App'x at 213; *see also Doninger v. Niehoff*, 527 F.3d 41, 53 (2d Cir. 2008) ("[A] class-of-one plaintiff must show . . . an 'extremely high degree of similarity between [himself] and the persons to whom [he] compare[s] [himself]' in order to succeed on an equal protection claim." (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006))); *King*, 260 F. App'x at 379-80 (explaining that, subsequent to *Olech*, the Second Circuit has "held that 'the level of similarity between [class of one] plaintiffs and the persons with whom they compare themselves must be extremely high'" (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005))); *Clubside,*

*Inc.*, 468 F.3d at 159 ("We have held that class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. This showing is more stringent than that used at the summary judgment stage in the employment discrimination context." (citation omitted)).

As an initial matter, plaintiffs' class of one claim fails because, as with their selective enforcement claim, plaintiffs cannot show that they were treated differently than similarly situated individuals. Although some district courts in the Second Circuit has stated that "the standard for 'similarly situated' when bringing a selective enforcement claim is the same as in a 'class of one' claim," *see, e.g., Kamholtz v. Yates Cnty.*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008); *Dones v. City of N.Y.*, No. 07 Civ. 3085, 2008 U.S. Dist. LEXIS 53681, at *28 (S.D.N.Y. July 9, 2008), the Court employs the slightly different formulations set forth by the Second Circuit for each claim. If anything, the two standards differ only in that the similarly situated standard for class of one claims is more stringent. *See Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 456 (W.D.N.Y. 2009) ("With respect to the existence of similarly situated persons, the standard of proof is even higher on a class-of-one claim than it is on a selective-enforcement claim."). Thus, because plaintiffs have failed to satisfy the similarly situated element of a selective enforcement claim, they cannot satisfy it for a class of one claim. *Everitt v. DeMarco*, No. 3:08-cv-543 (VLB), 2010 WL 1286940, at *10 (D. Conn. Mar. 30, 2010) ("The Court holds that the Plaintiffs' equal protection claim fails under either a selective enforcement or 'class of one' theory because they have neither alleged nor produced any evidence that they were treated differently from similarly situated individuals.

Indeed, Kathleen Everitt admitted during her deposition that she is unaware of any other spouses of Town police officers who have written a letter of complaint to the Commission. . . . Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' equal protection claim."); *Casciani*, 659 F. Supp. 2d at 457 ("The Court has already discussed plaintiff's alleged comparators in connection with his selective-enforcement claim, and will not repeat that discussion here. Suffice it to say that since plaintiff's showing was insufficient to withstand defendants' motion for summary judgment as to his selective-enforcement claim, his class-of-one claim falters on this ground as well."); *Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 116 (W.D.N.Y. 2009) ("First, to succeed on a class-of-one claim, plaintiff must show an extremely high degree of similarity between [himself] and the persons to whom [he] compare[s himself]. . . . For the reasons stated [in the selective enforcement discussion], plaintiff has not done so." (internal quotations and citations omitted)).

The third element of a class-of-one claim also bears particular emphasis in the instant case. A class of one claim cannot be based on treatment that was the result of a discretionary or subjective decision. Specifically, in *Engquist v. Oregon Department of Agriculture*, the Supreme Court held that plaintiffs asserting a class of one claim must show that the differential treatment received resulted from non-discretionary state action:

There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such

cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

553 U.S. 591, 603 (2008); *see also Siao-Pao v. Connolly*, 564 F. Supp. 2d 232, 245 (S.D.N.Y. 2008) ("Additionally, the Supreme Court recently clarified the *Olech* holding by limiting class of one claims in contexts characterized by individualized and subjective determinations . . . .").

One such discretionary action—discussed at length in the *Engquist* opinion itself—is the issuance of tickets by law enforcement officials. The Supreme Court stated that the issuance of a ticket to one individual who is breaking the law does not warrant a class of one claim—even if other lawbreakers were not ticketed:

Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been

singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself—the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

*Engquist*, 553 U.S. at 603-04. "When officials act within their discretion, basing their decision on a variety of factors that could yield different results on a case by case basis, the rationale of *Engquist* precludes a class of one challenge." *DePietro v. City of N.Y.*, No. 09-CV-932, 2010 WL 449096, at *10 (E.D.N.Y. Feb. 2, 2010).

Accordingly, under the facts of this case, particularly in light of plaintiffs' inability to demonstrate the existence of similarly situated individuals in the Village of Patchogue, plaintiffs have not shown that the issuance of tickets for their violation of the rental permit law was anything other than the discretionary issuance of tickets, and, thus, plaintiffs' class-of-one claim fails to survive summary judgment. *See Casciani*, 659 F.

Supp. 2d at 457 ("Even after the ordinance was passed, any action taken by the Town to enforce the ordinance was necessarily discretionary."); *Tarantino*, 615 F. Supp. 2d at 117 & n.11 ("[I]n a class-of-one case, the plaintiff must show that the difference in treatment resulted from non-discretionary governmental action. . . . Enforcement of the Code provisions at issue here clearly involved a degree of discretion on the part of the code enforcement officer, Aiken [and therefore] this claim must therefore be dismissed against all the defendants."); *Nasca v. Town of Brookhaven*, No. 05-CV-122, 2008 WL 4426906, at *11 n.4 (E.D.N.Y. Sept. 25, 2008) ("Although the *Engquist* decision was applied in the public employment context, the analysis by the Supreme Court suggests that 'class of one' challenges can only be made to non-discretionary decisions. Therefore, to the extent plaintiff is challenging the discretionary decisions by the Town as to the enforcement of its perrmit laws and code provisions, *Engquist* suggests that 'class of one' challenges cannot be asserted as to such decisions."); *Occhionero v. City of Fresno*, No. 05-1184, 2008 WL 2690431, at *9 (E.D. Cal. July 3, 2008) ("This Court will not legislate a class-of-one equal protection claim under the guise of a First Amendment retaliation claim to permit second guessing of the City's code enforcement measures at issue here.").[42] Thus, the Court

---

[42] The Court notes that since *Engquist*, at least two circuits have held that class of one claims cannot be raised in the law enforcement context. *See, e.g.*, *Flowers v. City of Minneapolis*, 558 F.3d 794, 799-800 (8th Cir. 2009) ("[W]hile a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim."); *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (holding that class of one claims cannot challenge the exercise of prosecutorial

grants defendants' motion for summary judgment on plaintiffs' class-of-one claim.

### D. Conspiracy Claims Against Fire Department

Plaintiffs also raise conspiracy claims against the Fire Department defendants.[43] Specifically, plaintiffs allege that the Fire Department defendants participated in a conspiracy, with the Village defendants, to deprive plaintiffs of their right to equal protection, in violation of 42 U.S.C. § 1985(3). The Fire Department defendants move for summary judgment on this claim on the ground that plaintiffs have not set forth any evidence of conspiracy. The Court agrees.

Section 1985(3) prohibits conspiracies by two or more persons that interfere with and injure any person's civil rights. More

specifically, the four elements of a § 1985(3) claim are:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*Mian v. Donaldson, Lufkin & Jenrette Sec.*, 7 F.3d 1085, 1087-88 (2d Cir. 1993) (citation omitted). "Furthermore, the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Id.* (quoting *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 829 (1983)). Because plaintiffs' Second Amended Complaint fails to allege any class-based, invidious discrimination, and plaintiffs have failed to present any evidence that any alleged discrimination was class-based, they have failed to raise a claim under § 1985(3). *See Lucas v. N.Y. City*, 842 F. Supp. 101, 104 (S.D.N.Y. 1994) (holding plaintiff failed to state claim under § 1985(3) when complaint was devoid of any such allegations). Therefore, summary judgment for the Fire Department defendants is warranted on this claim.

Furthermore, if plaintiffs were attempting assert a claim of conspiracy against the Fire Department under § 1983, that claim too would fail. To prove a § 1983 conspiracy claim, a plaintiff must show: (1) an agreement between two or more state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal. *See*

---

discretion); *see also Tarantino*, 615 F. Supp. 2d at 117 (finding that a class of one claim cannot be used to challenge the enforcement of a rental property ordinance). *But see Alfaro v. Labrador*, No. 06-CV-1470 (JS) (WDW), 2009 WL 2525128, at *9 (E.D.N.Y. Aug. 14, 2009) ("Considering the case at hand, and the established case law, the Court respectfully disagrees with the Eighth and Seventh Circuits that class of one claims can never be brought in the law enforcement context."). This Court's holding need not be so broad. Instead, the Court bases its holding on the facts and circumstances of the instant case, particularly where plaintiff has not demonstrated the existence of similarly situated individuals, and where all appearance dates on the summonses issued to plaintiffs were the same—namely, September 21, 2005.

[43] The Court confirmed at oral argument that this claim is only asserted against the Fire Department.

*Ostensen v. Suffolk Cnty.*, 236 F. App'x 651, 653 (2d Cir. 2007); *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

As established *supra*, the Fire Department's entry and search of the premises at 21 Church Street was warranted based on exigent circumstances. Plaintiffs do not dispute the facts that justify the Fire Department's entry. Plaintiffs do, however, contend that the Fire Department engaged in a conspiracy with Poulos to commit various constitutional violations against plaintiffs. This claim must fail. At oral argument, counsel for plaintiffs argued that plaintiffs have presented evidence of a "conspiracy" because, even though Fire Chief Wagner agreed to keep Poulos out of the apartment, he then called Poulos in to the apartment. As an initial matter, at oral argument, plaintiffs asserted the theory that the entry by Poulos was not warranted because he had *not* been called in by the Fire Department.

Moreover, plaintiffs offer no evidence other than their own "unsubstantiated speculation, to suggest that anything untoward took place." *See Scotto*, 143 F.3d at 115. Evidence of one exchange between Fire Chief Wagner and Fire Marshal Poulos, in which, if it occurred, Wagner reported to Poulos potential housing violations inside 21 Church Street, is insufficient to demonstrate the existence of a conspiracy. Plaintiffs offer no further evidence in support of this theory. Accordingly, the Court grants summary judgment in favor of defendants on plaintiffs' claim of conspiracy.[44]

E. Municipal Liability

As an initial matter, because plaintiffs have not demonstrated any constitutional violations by the Fire Department defendants, there is no basis on which they could predicate *Monell* liability against the Fire Department. When plaintiffs lack any underlying claim of a deprivation of a constitutional right, the claim of municipal liability on the part of the municipal defendant must be dismissed as well. *See Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 65 (2d Cir. 2009) (citing *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995)); *see also De Asis v. N.Y. City Police Dep't*, 352 F. App'x 517, 518 (2d Cir. 2009) ("We further note that the district court did not err in failing to address Appellant's claim of municipal liability for negligent supervision, in light of its correct finding that Appellant alleged no underlying constitutional violation."); *Jennis v. Rood*, 310 F. App'x 439, 440 (2d Cir. 2009) ("There cannot be an independent claim against the Department for municipal liability unless Jennis could prove a constitutional violation by one of the Onondaga County jail deputies."); *Segal v. City of N.Y.*, 459 F.3d 207, 219-20 (2d Cir. 2006) (holding that district court need not reach municipal liability claim where due process claims failed). Accordingly, the Fire Department defendants' motion for summary judgment on the *Monell* claim is granted. Thus the Court grants the Fire Department defendants' motion for summary judgment in entirety.

The Village of Patchogue argues that it is entitled to summary judgment on the grounds

---

[44] Plaintiffs attempt to create an issue of fact regarding whether Fire Chief Wagner instructed or authorized Poulos to enter or search the premises. However, as conceded at oral argument, the Village Fire Marshal is an employee of the Village, while the Fire District is a separate political subdivision. The Fire Chief does not have control or authority over the Village Fire Marshal. Accordingly, the Fire District is not responsible for the Fire Marshal's actions.

that plaintiffs have failed to demonstrate municipal liability as a matter of law. However, as set forth below, because the Court finds that genuine issues of material fact exist as to Patchogue's municipal liability, the Court rejects Patchogue's argument and denies its motion for summary judgment on this ground without prejudice to its renewing it prior to the jury's receipt of the case.

### 1. Legal Standard

#### a. Evidence of Municipal Custom or Policy

The Supreme Court expressly rejected liability pursuant to a theory of *respondeat superior* for purposes of § 1983 in *Monell*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[a] municipality will not be held liable under § 1983 unless plaintiffs can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of N.Y.*, No. 04-CV-1721, 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quotation marks omitted) (citing *Monell*, 436 U.S. at 690). However, "'the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)). The plaintiff in a § 1983 action bears the burden of establishing municipal liability. *See Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985).

"The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). A policy, custom, or practice of the municipal entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Kern*, 93 F.3d at 44). "A municipality's failure to train or supervise its officers can rise to the level of an actionable policy or custom where it amounts to 'deliberate indifference' to the constitutional rights of its citizens." *Hall v. Marshall*, 479 F. Supp. 2d 304, 315-16 (E.D.N.Y. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) and *Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999) ("A municipality may be liable under § 1983 . . . where the City's failure to supervise or discipline its officers amounts to a policy of deliberate indifference.")).

#### b. Policymakers

In addition to demonstrating directly that a municipality has a custom or policy that led to a constitutional violation, the Second Circuit has held that a plaintiff may demonstrate municipal liability by showing that a municipal "policymaker" violated plaintiff's constitutional rights:

> Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid

policy, or by a [municipal] employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the [municipality's] authorized policymakers.

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see also Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights."); *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002) ("A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation. . . ."). Indeed, "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy." *Gronowski*, 424 F.3d at 296; *see also Amnesty Am.*, 361 F.3d at 126 ("Thus, even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986))). "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. . . . The relevant legal materials[] include state and local positive law, as well as custom or usage having the force of law." *Jeffes v. Keenan*, 208 F.3d 49, 57 (2d Cir. 2000). Specifically, "'[t]he matter of whether the official is a final policymaker under state law is to be resolved by the trial judge *before* the case is submitted to the jury.'" *Richardson v. Metro. Dist. Comm'n*, No. 3-00-CV-1062, 2003 U.S. Dist. LEXIS 12757, at *20 (D. Conn. July 23, 2003) (quoting *Jeffes*, 208 F.3d at 57).

In particular, where a municipal official "'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Gronowski*, 424 F.3d at 296 (quoting *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)); *see also Diodati v. City of Little Falls*, No. 6:04-CV-446, 2007 U.S. Dist. LEXIS 4322, at *6 (N.D.N.Y. Jan. 18, 2007) ("A policymaker is an individual whose 'decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions.'" (quoting *Anthony v. City of N.Y.*, 339 F.3d 129, 139 (2d Cir. 2003) (internal citation and quotation marks omitted))). Moreover, "the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the [municipality's] business." *Jeffes*, 208 F.3d at 57 (citation and quotation marks omitted) (emphasis in original). "Thus, the Court must ask whether [the] governmental official [is a] final policymaker[] for the local government in a particular area, or on [the] particular issue involved in the action." *Id.* (citations and quotation marks omitted); *see also Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 543 (D. Conn. 2006) ("The critical inquiry is not whether an official *generally* has final policymaking authority; rather, the court must

specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit.") (emphasis in original). However, "[a]lthough the official in question does not have to be a final policymaker for all purposes, but only with respect to the conduct challenged, simply exercising discretion in an area where that official is not the final policymaker under state law cannot, by itself, establish municipal liability." *Barry v. N.Y. City Police Dept.*, No. 01 Civ. 10627, 2004 U.S. Dist. LEXIS 5951, at *43 (S.D.N.Y. Apr. 7, 2004; *see also Diodati*, 2007 U.S. Dist. LEXIS 4322, at *6 ("An individual who merely has discretion to handle a particular situation is not a policymaker."); *Richardson*, 2003 U.S. Dist. LEXIS 12757, at *20 ("Mere discretion in the performance of his duties is not sufficient. However, the official need only have the power to make official policy on a particular issue."). On the other hand, where a policymaker "exceeded the bounds of the authority granted to him," his actions "cannot be fairly said to represent official policy." *Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 544 (D. Conn. 2006) ("[A]lthough Giordano is generally a final policymaker for Waterbury, Giordano's specific actions in this case cannot be fairly said to represent official policy, because under state law, he exceeded the bounds of the authority granted to him.").

## 2. Application

As an initial matter, plaintiffs have pointed to no policies or customs within the Village of Patchogue upon which municipal liability could be predicated. Plaintiffs also claim that municipal liability is warranted under a failure to train or supervise theory. However, as stated by one court in this Circuit:

the "mere assertion that a municipality has such a policy is insufficient to establish *Monell* liability," *Perez v. City of N.Y.*, 97 Civ. 2915, 2002 U.S. Dist. LEXIS 4297, at *4 (E.D.N.Y. Mar. 14, 2002), and in any case Plaintiff may not overcome summary judgment by relying "merely on allegations or denials in its own pleading," Fed. R. Civ. P. 56(e). Here, Plaintiff has not shown a set of facts, by affidavit, deposition or otherwise, that could lead a reasonable juror to conclude that *Monell* liability is appropriate for the City of New York. The standard for liability based on a claim of failure to train is a high hurdle to overcome. A plaintiff must establish through admissible evidence that "the failure to train amounts to deliberate indifference to the rights of those whom municipal employees will come into contact," and "only where a failure . . . reflects a deliberate or conscious choice by a municipality . . . can a city be liable for such failure under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

*Manganiello v. City of N.Y.*, No. 07 Civ. 3644 (HB), 2008 WL 2358922, at *10 (S.D.N.Y. June 10, 2008). The Court agrees with this analysis and concludes that plaintiffs have failed to provide evidence of any policy or procedure whereby the Village defendants permitted, encouraged, or trained their employees to engage in constitutional violations.

The Court, however, denies Patchogue's motion with respect to liability predicated upon the acts of a policymaker. The matter of

whether a given official is a municipal policymaker for § 1983 purposes is a question of law for determination by the Court. *See Bliven v. Hunt*, 579 F.3d 204, 214 (2d Cir. 2009). Plaintiffs argue that defendant Poulos, as the Fire Marshal, was a policymaker for the Village of Patchogue.[45] The Court agrees. Poulos's deposition testimony provides ample basis for the Court to conclude that Poulos possesses "final authority over significant matters involving the exercise of discretion." *Gronowski*, 424 F.3d at 297 (quotation omitted). Specifically, Poulos testified as follows:

> Q: When you say "setting procedures," meaning chief fire marshal is the person who sets procedures?
>
> A: Yes.
>
> Q: What kind of procedures would the chief fire marshal set, generally speaking?
>
> * * *
>
> A: What's going to be inspected at what time frames. What is going to be done when. Who is going to do that. How you are going to do an investigation. What the order is. How you are going to do numerous activities.
>
> Q: Is it fair to say that the chief fire

marshal is the person who is making all these decisions for those under him?

> * * *
>
> A: Yes.
>
> Q: Does chief fire marshal decide who gets inspected?
>
> * * *
>
> A: Yes.
>
> Q: Does the chief fire marshal determine what a proper investigation is and how it is conducted?
>
> * * *
>
> A: Yes.
>
> Q: Does the chief fire marshal determine the circumstances under which an inspection should be performed, just generally speaking?
>
> * * *
>
> A: Yes.
>
> Q: When you're setting out the procedures for inspections, that means you are determining the policies of the fire department — I'm sorry, the subordinates under you and how they should perform; is that a correct statement?
>
> * * *
>
> A: Yes.

(Poulos Dep. at 25-27.) Municipal liability

---

[45] Plaintiffs did not present any evidence that suggests that—and plaintiffs do not argue in their opposition papers that—Code Enforcement Officer James Nudo was a policymaker. Accordingly, municipal liability could not be imposed based on this theory for Nudo's actions.

may attach under § 1983 when a policymaker takes action that violates an individual's constitutional rights, and such liability may be based on one individual action by a policymaker. *See Gronowski*, 424 F.3d at 296. Because there are disputed issues of fact regarding whether Poulos's behavior was a violation of plaintiffs' Fourth Amendment rights, and because the Court determines that Poulos is a policymaker within the Village of Patchogue, the Village defendants' motion for summary judgment regarding municipal liability is denied.

## II. QUALIFIED IMMUNITY

The remaining individual defendants—namely, Poulos and Nudo—also contend that they are entitled to summary judgment on qualified immunity grounds for all of the constitutional violations claimed by plaintiffs.[46] For the reasons set forth below, however, the Court denies summary judgment to the individual defendants on this ground because disputed issues of fact exist that must be resolved before the issue of qualified immunity could be decided in this case.

### A. Legal Standard

According to the Second Circuit, government actors may be shielded from

liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) (explaining that government officers "are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law"). "A right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . The unlawfulness must be apparent." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) (citations and quotation marks omitted). In addition, the Second Circuit has repeatedly stated that qualified immunity only protects officials performing "discretionary functions." *See Simons v. Fitzgerald*, 287 F. App'x 924, 926 (2d Cir. 2008) ("'Qualified immunity shields government officials performing discretionary functions from liability for civil damages . . . .'" (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007))); *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 208 (D. Conn. 2005) ("'The qualified immunity doctrine protects government officials from civil liability in the performance of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" (quoting *Lee v. Sandberg*, 136 F.3d 94, 100 (2d Cir. 1997))).

As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their

---

[46] The issue of qualified immunity does not affect the Village of Patchogue because "[m]unicipalities do not enjoy either absolute or qualified immunity from suit under Section 1983." *White River Amusement Pub, Inc. v. Town of Hartford*, 412 F. Supp. 2d 416, 429 n.6 (D. Vt. 2005) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993)), *aff'd*, 481 F.3d 163 (2d Cir. 2007).

duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (quotation marks omitted)). Thus, qualified immunity is not merely a defense but is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, courts should determine the availability of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

With respect to the summary judgment stage in particular, the Second Circuit has held that courts should cloak defendants with qualified immunity at this juncture "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." (citations and quotation marks omitted)); *Stancuna v. Sherman*, tancuna v. Sherman, 563 F. Supp. 2d 349, 356 (D. Conn. 2008) ("Here, the court finds that summary judgment on qualified immunity grounds is inappropriate. As the Second Circuit has held, [w]hen a motion for summary judgment is made in the context of a qualified

immunity defense, the question of whether the factual disputes are material is even more critical. As noted above, there are issues of material fact in this case that this court may not decide. These issues of fact are critical to determining whether Sherman was operating under a reasonable belief as to what kind of search he was permitted to conduct." (citation and quotation marks omitted)).

### B. Application

Here, the Court examines qualified immunity only with respect to plaintiffs' surviving claims—namely, their claims for malicious abuse of process (which implicate defendant Nudo) and unreasonable search and seizure (which implicate defendant Poulos). The Court concludes that the Village defendants have failed to set forth undisputed evidence that establishes that these individual defendants are entitled to qualified immunity; rather, there are disputed issues of fact in this case that must be resolved in order to determine whether qualified immunity would be warranted. Accordingly, the Village defendants' motion for summary judgment for the individual defendants based on qualified immunity is denied at this juncture.

### 1. Malicious Abuse of Process

The constitutional right to be free from a malicious abuse of process is well established, and was clearly established at the time of the alleged abuse of process in the instant case. *See Jovanovic v. City of N.Y.*, No. 04 Civ. 8437 (PAC), 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) ("If Plaintiff is able to provide additional facts to support his abuse of process claim, then he will have adequately alleged the violation of his constitutional right to be free from malicious abuse of process, as guaranteed by the Fourteenth Amendment's procedural

due process clause. This constitutional right was clearly established at the time that Bonilla arrested Jovanovic and filed charges against him in 1996."); *Phelps v. City of N.Y.*, No. 04 CIV. 8570 (DLC), 2006 WL 1749528, at *8 (S.D.N.Y. June 27, 2006) ("There can be no dispute that the prohibitions against arrest without probable cause, malicious prosecution, and malicious abuse of process are clearly established under the law."); *see also Cook*, 41 F.3d at 80 (declaring, in 1994, that, "[i]n the criminal context, malicious abuse of process is 'by definition a denial of due process'""). If, as alleged by plaintiffs, Nudo issued plaintiffs' summonses and tickets for their violation of the rental permit law as an attempt to compel plaintiffs to cease their challenge to the constitutionality of the Rental Permit Law, with the intent to do harm without excuse or justification, then Nudo will not be entitled to qualified immunity on plaintiffs' abuse of process claims. Accordingly, the Village defendants' motion for summary judgment on this ground is denied at this juncture.

## 2. Unreasonable Search

"[T]he right to be free from a warrantless search of a private dwelling executed under color of municipal building law has been clearly established for decades, as both the Supreme Court and the New York Court of Appeals long ago recognized that the Fourth Amendment protects the owner of a private dwelling from warrantless administrative inspections of that dwelling." *Cullen v. Vill. of Pelham Manor*, No. 03-CV-2168 (CS), 2009 WL 1507686, at *11 (S.D.N.Y. May 28, 2009) (citing *Camara v. Mun. Court of City & Cnty. of S.F.*, 387 U.S. 523, 534 (1967)); *Sokolov v. Vill. of Freeport*, 420 N.E.2d 55, 57 (N.Y. 1981) (finding "rental permit ordinance . . . unconstitutional insofar as it effectively authorizes and . . . requires a warrantless inspection of residential rental property"). Accordingly, the Village defendants cannot argue that it was not clearly established at the time of the events giving rise to this action that the Fourth Amendment warrant requirement applied to administrative searches such as Poulos's search of 21 Church Street. *See Cullen*, 2009 WL 1507686, at *11.

However, if Poulos had an objectively reasonable belief that (1) a warrantless search without consent was justified based on his belief that there were exigent circumstances requiring his immediate attention, or (2) he had consent to search from an individual authorized to give it, he is entitled to qualified immunity. *See Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 61 (2d Cir. 2003) (holding that officers were entitled to qualified immunity where defendant officers could have reasonably believed that they were given sufficient third party consent to search); *see also Simms v. Vill. of Albion, N.Y.*, 115 F.3d 1098, 1109 (2d Cir. 1997) (holding that defendant officers were entitled to qualified immunity as a matter of law where they relied upon consent of property owner to perform search); *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 344 (E.D.N.Y. 2006) ("[T]he search and seizure was reasonable under the emergency aid doctrine because the officers reasonably believed that it was necessary to protect the occupants of the residence from imminent injury." (citing *Brigham City v. Stuart*, 547 U.S. 398 (2006))).

If all of plaintiffs' evidence is credited, and the jury finds that (1) there was no exigency justifying Poulos's entry of 21 Church Street on July 25, 2005; (2) Poulos was not informed by the Fire Department that there was an exigent circumstance in the building that required his immediate entry on July 25, 2005, such that Poulos obtained a reasonable belief

that his warrantless entry was justified; and (3) Gucciardo did not consent—or, if she did provide consent, did not voluntarily consent—to the search of 21 Church Street; and (4) Poulos did not reasonably believe that Gucciardo, if she consented to the search, had the apparent authority to consent to a search of the locked room in the basement, then Poulos's violation of plaintiffs' constitutional rights was not objectively reasonable, and qualified immunity is not warranted to shield Poulos from liability.[47] Accordingly, the Village defendants' motion for summary judgment on the issue of qualified immunity is denied.

\* \* \*

In sum, as described above, the Court has found that genuine issues of material fact preclude the Court from determining as a matter of law that plaintiffs' clearly established rights were not violated. Thus, the critical question is whether it was objectively reasonable for the individual Village defendants to believe that they were not committing such violations, and the

Court declines to so conclude as a matter of law that it was objectively reasonable for the Village defendants to believe that they were not violating plaintiffs' rights. Here, for the reasons stated *supra*, the Court has determined that—if plaintiffs' version of events is credited in its entirety (i.e., there was no consent to search by Gucciardo and no exigent circumstances warranting Poulos's search of the house)—the individual Village defendants subjected plaintiffs to an unauthorized warrantless search and seizure, and there could be no basis to conclude that the individual defendants' conduct was objectively reasonable. Accordingly, the Court denies the individual Village defendants' summary judgment motion on qualified immunity grounds.[48]

---

[47] The Court further notes that in 2006, the Supreme Court decided *Georgia v. Randolph*, 547 U.S. 103 (2006), and held that, under the circumstances of that case, a physically present co-occupant's stated refusal to permit entry renders warrantless entry and search unreasonable and invalid as to him. *See id.* at 106. This decision was issued a year after the alleged events of July 25, 2005. However, because the Court determines that disputed issues of fact exist with respect to Gucciardo's alleged consent, the Court need not determine at this juncture whether this rule regarding the presence of nonconsenting persons during a warrantless search was "clearly established" on July 25, 2005, such as to abrogate Poulos's qualified immunity on that ground.

[48] The Court notes that, in order to determine the availability of the qualified immunity defense in this case at trial, the Court is prepared to follow the procedures set forth by the Second Circuit in *Zellner v. Summerlin*, 494 F.3d 344, 367-68 (2d Cir. 2007). Specifically, although "the ultimate question of whether it was objectively reasonable for [defendants] to believe that [their] conduct did not violate a clearly established right, i.e., whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court," *id.* at 367, the jury must first "resolve[] any disputed facts that are material to the qualified immunity issue." *Id.* at 368. Further, "[t]o the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. *Id.* (citations omitted) (noting that "if the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding"). In particular, "'the jury should decide these issues on special interrogatories.'" *Id.* (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)). Once the jury has determined these factual issues, the Court will—if necessary—afford

## V. CONCLUSION

For the foregoing reasons, the Court grants the Fire Department defendants' motion for summary judgment in its entirety, and those defendants are dismissed from the case. The Court denies the Village defendants' motion for summary judgment with respect to plaintiffs' malicious abuse of process claim, Fourth Amendment unreasonable search claim as pertaining to the basement at 21 Church Street, and municipal liability claims. The Court grants the Village defendants summary judgment with respect to plaintiffs' First Amendment, Fourteenth Amendment, and remaining Fourth Amendment claims. The Court also denies defendants' motion for summary judgment with respect to the issue of qualified immunity.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 23, 2010
Central Islip, New York

\* \* \*

Plaintiffs are represented by Robert A. Siegel, Esq., 205 East 60th Street, New York, NY 10022. The Village defendants are represented by Brian S. Sokoloff of Sokoloff Stern LLP, 355 Post Avenue, Suite 201, Westbury, NY 11501. The Fire Department defendants are represented by Jeffrey B. Siler, of Siler & Ingber, LLP, 1399 Franklin Avenue, Suite 103, Garden City, NY 11530.

---

defendants an additional opportunity to renew their motion with respect to qualified immunity. *See, e.g.*, *id.* at 364.