# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

––––––––––––––––––

Nº 06-CV-5716 (JFB) (AKT)

––––––––––––––––––

## JOHN MANGINO AND ELAINE MANGINO,

Plaintiffs,

VERSUS

## INCORPORATED VILLAGE OF PATCHOGUE, FIRE MARSHALL JOHN P. POULOS, CODE ENFORCEMENT OFFICER JAMES NUDO, PATCHOGUE FIRE DEPARTMENT, FIRE CHIEF JOSEPH WAGONER, UNIDENTIFIED EMPLOYEES AND AGENTS OF THE INCORPORATED VILLAGE OF PATCHOGUE AND UNIDENTIFIED EMPLOYEES AND AGENTS OF THE PATCHOGUE FIRE DEPARTMENT,

Defendants.

––––––––––––––––––

**MEMORANDUM AND ORDER**
September 30, 2011

––––––––––––––––––

JOSEPH F. BIANCO, District Judge:

Defendants Incorporated Village of Patchogue ("the Village" or "Patchogue"), Fire Marshall John P. Poulos ("Poulos"), and Code Enforcement Officer James Nudo ("Nudo") (collectively "defendants" or "the Village defendants") bring the instant motion for reconsideration, pursuant to Local Civil Rule 6.3, of the Court's September 23, 2010 Memorandum and Order, granting in part and denying in part the defendants' motion for summary judgment.[1]

Specifically, defendants argue that they are entitled to summary judgment on plaintiffs' malicious abuse of process claim because (1) plaintiffs did not offer any evidence to support this claim, and (2) Nudo is entitled to qualified immunity. In addition, defendants contend that they are entitled to summary judgment on plaintiffs' Fourth Amendment claim based

––––––––––––––––––

[1] *See Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205 (E.D.N.Y. 2010), hereinafter, "*Mangino*" or "September 23 Memorandum and Order."

upon Poulos' entry into the basement because of the following: (1) plaintiffs have no standing to challenge Poulos' entry into the basement; (2) there is no genuine issue of material fact as to whether exigent circumstances existed in the basement; and (3) Poulos is entitled to qualified immunity.

For the reasons set forth below, the Court grants defendants' motion for reconsideration as to the malicious abuse of process claim because, after carefully considering the arguments and the supplemental briefing, the Court concludes that Nudo is entitled to qualified immunity.    However, for the reasons set forth in the September 23 Memorandum and Order and below, the Court denies the defendants' motion for reconsideration of the Fourth Amendment claim.

I. BACKGROUND

A. Procedural History

Plaintiffs filed the complaint in this action on September 23, 2006.  On January 17, 2007, plaintiffs filed an Amended Complaint.  On March 16, 2007, defendants answered the Amended Complaint.    On February 14, 2008, plaintiffs filed a Second Amended Complaint.  Defendants answered this complaint on March 17, 2008.

On October 22, 2009, defendants requested a pre-motion conference in anticipation of filing a motion for summary judgment.  The Fire Department defendants submitted their motion for summary judgment on February 16, 2010. The Village defendants submitted their motion for summary judgment on February 19, 2010. Plaintiffs submitted their opposition on June 18, 2010.  Defendants submitted their replies

on August 20, 2010.  The Court held oral argument on August 31, 2010.  The Village defendants filed supplemental letters with the Court on September 3, 2010 and September 10, 2010, addressing additional issues raised at oral argument.  Plaintiffs filed supplemental letters with the Court on September 7, 2010 and September 8, 2010.  On September 23, 2010, the Court granted in its entirety the Fire Department's motion for summary judgment. The Court also granted in part and denied in part the Village defendants' motion for summary judgment.

On October 7, 2010, the Village defendants filed a motion for reconsideration.  On October 13, 2010, the Village defendants also filed a Notice of Appeal.  On November 11, 2010, plaintiffs filed their opposition to the motion for reconsideration.  On November 24, 2010, the Village defendants filed their reply.  On January 6, 2011, the Court heard oral argument on the motion for reconsideration.  On January 7, 2011, plaintiffs' counsel submitted a letter correcting a misstatement during oral argument.  On January 13, 2011, the Village defendants submitted a supplemental letter to address issues raised at oral argument.  On February 3, 2011, plaintiffs responded to the post-oral argument submission by the Village defendants.  On February 14, 2011, the Village defendants filed a reply.  The Court has fully considered all the submissions of the parties.

B. The September 23, 2010 Memorandum and Order

On September 23, 2010, in a 60-page Memorandum and Order, the Court granted in part and denied in part the pending motions for summary judgment.  In particular, the Court granted the Fire Department defendants' motion for summary judgment in its entirety, and those defendants were dismissed from the

case. The Court denied the Village defendants' motion for summary judgment with respect to plaintiffs' malicious abuse of process claim, Fourth Amendment unreasonable search claim as pertaining to the basement at 21 Church Street, and the municipal liability claim. The Court granted the Village defendants' motion for summary judgment with respect to plaintiffs' First Amendment, Fourteenth Amendment, and remaining Fourth Amendment claims. The Court also denied defendants' motion for summary judgment with respect to the issue of qualified immunity on the above-referenced malicious abuse of process and Fourth Amendment claims.

## II. STANDARD OF REVIEW

Under Local Civil Rule 6.3, reconsideration is appropriate only if "'the court overlooked matters or controlling decisions which, had they been considered, might reasonably have altered the result reached by the court.'" *United States v. U.S. Currency in the Sum of Ninety Seven Thousand Two Hundred Fifty-Three Dollars*, No. 95 Civ. 3982 (JG), 1999 WL 84122, at *2 (E.D.N.Y. Feb. 11, 1999) (quoting *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.*, No. 86 Civ. 6447 (JMC), 1989 WL 162315, at *4 (S.D.N.Y. Aug. 4, 1989) (internal quotation marks omitted)); *see Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995) ("The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."); *see also Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*, No. 97 Civ. 6612 (SJ), 2006 U.S. Dist.

LEXIS 7635, at *4 (E.D.N.Y. Feb. 15, 2006) ("The standard . . . is strict in order to dissuade repetitive arguments on issues that have already been considered fully by the Court."); *Davis v. The Gap*, 186 F.R.D. 322, 324 (S.D.N.Y. 1999) (stating that "the court must not allow a party to use the motion to reargue as a substitute for appealing from a final judgment"). The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court, *U.S. Currency*, 1999 WL 84122, at *2 (citing *Cohen v. Koenig*, 932 F. Supp. 505, 506 (S.D.N.Y. 1996)), and "is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys. Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (internal quotation and citation omitted).

## III. DISCUSSION

### A. The Abuse of Process Claim

In the motion for reconsideration, defendant Nudo argues that he is entitled to summary judgment on plaintiffs' malicious abuse of process claim because (1) plaintiffs did not offer any evidence to support this claim, and (2) Nudo is entitled to qualified immunity. Having carefully considered the motion for reconsideration, the Court concludes that Nudo is entitled to qualified immunity on the abuse of process claim because, although there was a clearly established right to be free from malicious abuse of process at the time of the alleged conduct, it was not clearly established that such a claim can exist even when probable cause existed for the issuance of the tickets. Accordingly, summary judgment is granted in defendant Nudo's favor on the malicious abuse of process claim.

3

(1) Issue of Probable Cause

As a threshold matter, although defendants argue in the motion for reconsideration that the existence of probable cause establishes a complete defense to abuse of process claim in every case (Defs.' Mem. of Law, at 9), the Court disagrees and adheres to its analysis in the September 23 Memorandum and Order. *See* September 23 Memorandum and Order, at 22. As this Court noted in the September 23 Memorandum and Order, the Second Circuit has stated that "[a]buse of process, however, does not depend upon whether or not the action was brought without probable cause or upon the outcome of the litigation." *Lodges 743 and 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp.*, 534 F.2d 422, 465 n. 85 (2d Cir. 1975). In fact, the Second Circuit has explained that the non-dispositive nature of the probable cause inquiry is one of the characteristics of an abuse of process claim that distinguishes it from a malicious prosecution claim. *See Weiss v. Hunna*, 312 F.2d 711, 717 (2d Cir. 1963) ("'[T]he gist of the tort' of abuse of process, [as] distinguished from malicious prosecution, 'is not commencing an action or causing process to issue without justification, but misusing or misapplying process *justified in itself* for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance.'" (emphasis added) (quoting Prosser, Torts, at 667-68 (2d ed. 1955)).[2]   Consistent with the analysis in

*United Aircraft Corp.* and *Weiss*, the Second Circuit has never included a lack of probable cause as an element of a malicious abuse of process claim; rather, a plaintiff may assert a malicious abuse of process claim where a defendant: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

Defendants correctly point to a series of cases in this Circuit (discussed *supra* in connection with qualified immunity), including one case decided by this Court in *Pierre v. City of New York*, 05-CV 5018 (JFB) (KAM), 2007 WL 2403573, at *12 (E.D.N.Y. Aug. 17, 2007), which have suggested, explicitly or implicitly, that probable cause is a complete defense to an abuse of process claim. (*See* Defs.' Mem. of Law, at 9-11.) Thus, defendants argue that, although lack of probable cause is not an element of an abuse of process claim, it is a complete defense because it provides the defendant, as a matter of law, an excuse or justification under the second

---

[2]   Although they have no precedential value as unreported decisions, the Court notes the Second Circuit, in several summary orders, has explicitly or implicitly continued to find that the absence of probable cause is not required for an abuse of

process claim to proceed. *See, e.g., DiSorbo v. Hoy*, Nos. 02-7586, 02-7922, 02-7956, 02-7988., 2003 WL 22037275, at *2 (2d Cir. Aug. 29, 2003) ("While the absence of probable cause is an essential element of a false arrest claim, liability for abuse of process does not require a showing of a lack of probable cause.") (citations omitted); *see also Ingersoll v. LaPlante*, No. 02-9050, 2003 WL 21949752, at *2 (2d Cir. 2003) (noting that probable cause is a complete defense to false arrest, false imprisonment, and malicious prosecution claims, but then separately analyzing the abuse of process claim).

element. (*See* Defs.' February 14, 2011 Letter, at 4-5.) To the extent that this Court's decision in *Pierre* suggests that *Savino* stands for the legal proposition that probable cause is always a defense to a malicious abuse of process claim, that reading of *Savino* is incorrect. Instead, the situation in *Pierre* and *Savino* (and it appears in many other similarly decided cases in other courts) was that there was no evidence of "intent to harm" or a "collateral objective," other than plaintiffs' argument that one should infer such intent to harm, or a collateral objective, from the absence of probable cause. Therefore, where plaintiff's only argument to support such elements is a purported lack of probable cause, such claims must fail if probable cause is found to exist. *See Savino*, 331 F.3d at 77 ("[T]he District Court erred in holding that genuine issues of material fact existed with respect to probable cause. Accordingly, it also erred [in connection with the abuse of process claim] in relying on a lack of probable cause that in, that in securing Savino's arrest, defendants acted with malice or with a collateral objective that was outside the legitimate ends of the legal process."); *see also Phelps v. City of N.Y.*, No. 04 CIV. 8570 (DLC), 2006 WL 1749528, at *5 (S.D.N.Y. June 27, 2006) ("the absence of probable cause is probative of the lack of justification for the officers' actions and the existence of a collateral objective"). On the other hand, if plaintiff can demonstrate the elements of abuse of process—including intent to harm and a collateral objective—without relying on any inference from a lack of probable cause, then such a claim can survive even with probable cause. Therefore, the Court rejects defendants' argument that the existence of probable cause is a complete defense to the abuse of process claim. *See also VanZandt v. Fish & Wildlife Serv.*, 524 F. Supp. 2d 239,

247 (W.D.N.Y. 2007) ("[P]rocess properly issued on probabl[e] cause can nonetheless be abused.").

However, that does not end the inquiry because defendants argue, in the alternative, that defendant Nudo is entitled to qualified immunity because, given the above-referenced ambiguity in the case authority, it was objectively reasonable for him to believe that probable cause is a complete defense to an abuse of process claim. As set forth below, the Court agrees and concludes that defendant Nudo is entitled to qualified immunity on this ground.

(2) Legal Standard for Qualified Immunity[3]

Government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). In addition, the Second Circuit has repeatedly stated that qualified immunity only protects officials performing "discretionary functions." *See Simons v. Fitzgerald*, 287 F. App'x 924, 926 (2d Cir. 2008) ("'Qualified immunity shields government officials performing discretionary functions from liability for civil damages . . . .'" (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007))).

As articulated by the Supreme Court and Second Circuit, "[w]hen a defendant invokes

---

[3] Although the standard was correctly articulated by the Court in the September 23 Memorandum and Order (*see* Memorandum and Order, at 55-58), the Court has again included the standard here for purposes of convenience, including some additional case authority.

qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott,* 599 F.3d 129, 133 (2d Cir. 2010) (quoting and citing *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)).[4]

This Court has already held that, taking the evidence in the light most favorable to plaintiffs, an abuse of process claim would survive summary judgment. Thus, the Court proceeds to the second part of the inquiry: whether the federal right at issue was clearly established.

With respect to part two, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. In other words, "[a] right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . The unlawfulness must be apparent." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) (citations and quotation marks omitted).

This Court correctly noted in the September 23 Memorandum and Order that there is no question that the right to be free from malicious abuse of process was clearly established as a general proposition long before the alleged abuse of process in the instant case. *See* Memorandum and Order, at 56-57 (citing cases). However, as the Supreme Court noted in *Saucier,* "that is not enough." 533 U.S. at 202. Instead, the Supreme Court has emphasized that "[t]his inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." *Saucier,* 533 U.S. at 201. Therefore, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the law." *Saucier,* 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, at 640 (1987)).

In order to make this determination, courts should consider in particular circumstances: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 129-30 (2d Cir. 2004) (quotations and citations omitted).

---

[4] *Pearson* overruled the Court's prior holding, in *Saucier v. Katz,* 533 U.S. 194 (2001), that courts were mandated to proceed through the two-step inquiry in a particular order. 533 U.S. at 201. *See Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 430 (2d Cir. 2009) (explaining *Pearson*). The Court recognized, however, that the traditional sequence "is often appropriate." *Pearson*, 555 U.S. at 236.

### (3) Application[5]

Although the Second Circuit has certainly held in some cases that abuse of process does not depend upon whether the action was brought with probable cause or not, there is sufficient ambiguity on this issue in numerous cases in this circuit such that a reasonable officer would not have understood that his acts were unlawful in this case. In particular, as this Court noted in the September 23 Memorandum and Order (and as discussed *supra*), numerous district courts in this Circuit, have suggested that probable cause is a complete defense to a claim for abuse of process. *See, e.g., Pierre v. City of New York*, 05-CV-5018 (JFB)(KAM), 2007 WL 2403573, at *12 (E.D.N.Y. Aug. 17, 2007) (holding, in the alternative, that summary judgment was warranted on abuse of process claim because defendants established probable cause to prosecute plaintiffs); *Golden v. City of New York*, 418

F. Supp. 2d 226, 235 (E.D.N.Y. 2006) ("Since I have concluded that there was probable cause for plaintiff's arrest and prosecution, defendants had an excuse and justification for employing regularly issued process."); *DeVito v. Barrant*, 03-CV-1927 (DLI) (RLM), 2005 WL 2033722, at *9 (E.D.N.Y. Aug. 23, 2005) ("the existence of probable cause, which the court has found as a matter of law, bars plaintiff's abuse of process claim"); *Almonte v. City of New York*, 03-CV-5078 (ARR), 2005 WL 1229739, at *5 (E.D.N.Y. May 20, 2005) ("The existence of probable cause offers a complete defense to a claim of abuse of process."); *Hickey v. City of N.Y.*, No. 01 Civ. 6506 (GEL), 2004 WL 2724079, at *7 (S.D.N.Y. Nov. 29, 2004) (concluding that probable cause offers a complete defense to an abuse of process claim); *Granato v. City of N.Y.*, No. 98 Civ. 667, 1999 WL 1129611, at *7 (E.D.N.Y. Oct. 18, 1999) (probable cause an "excuse or justification" that defeats abuse of process claim). In fact, in an unreported decision, the Second Circuit reaches the same conclusion in language that appears to contradict its prior decisions in cases like *United Aircraft Corp.* and *Weiss*. *Jones v. J.C. Penny's Dept. Stores, Inc.*, 317 Fed. App'x. 71, 74 (2d Cir. 2009) ("The conclusion that Jones could not prevail on her claims that the officers lacked probable cause for her arrest or that they discriminated against her based on her race required dismissal of her state and federal claims of abuse of process."). As discussed above, this Court believes that these holdings can be explained by the fact that it appears that, in each one of those cases, the only plausible evidence of "intent to harm" or "malice" (or a "collateral objective") was the plaintiff's attempt to draw such an inference from the absence of probable cause. In short, there appears to have been no allegation or suggestion of malice or collateral objective apart from the alleged lack of probable cause.

---

[5] The doctrine of qualified immunity applies to "*federal* causes of action but is not generally understood to protect officials from claims based on state law." *Jenkins v. City of New York*, 478 F.3d 76, 86 (2d Cir. 2007) (emphasis in original). However, New York common law "grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006); *accord Stein v. Barthelson*, 2011 WL 1332052, at *3 (2d Cir. April 8, 2011) (summary order). Here, to the extent that plaintiffs have brought a malicious abuse of process claim under state law (in addition to the Section 1983 claim), the Court exercises supplemental jurisdiction and concludes that qualified immunity under New York common law is warranted because of the same ambiguities in the law at the time of the alleged offense, discussed *infra*, with respect to the Section 1983 claim.

Therefore, in those cases, no malice or collateral objective could be proven as a matter of law once probable cause was determined by the court to exist.

However, this potential explanation for the rationale behind these cases does not eviscerate qualified immunity for officers who could have objectively relied upon these broad statements of law by numerous courts in this Circuit. In other words, even if these other above-referenced cases could be reconciled with Second Circuit authority stating lack of probable cause is not an element to an abuse of process claim, the language of these cases is broad and unqualified. Thus, an officer could have reasonably relied upon these cases, despite some Second Circuit authority to the contrary, to conclude that his actions in issuing the tickets was lawful, as an absolute manner, if he had probable cause. To put it succinctly, if courts in this Circuit cannot agree on the state of the law on this critical issue, certainly law enforcement officers should not be held accountable, for purposes of qualified immunity under the circumstances of this case, for actions which may constitute a constitutional violation in this unclear area of the law. *See, e.g., Cornell v. Kapral*, No. 5:09-CV-0387 (GTS/ATB), 2011 WL 94063, at *13 (N.D.N.Y. Jan. 11, 2011) (defendant entitled to qualified immunity on abuse of process claim "because the Court has already concluded that Defendant Karpal had probable cause to arrest Plaintiff, and at the time Defendant Karpal commenced his investigation against Plaintiff and ultimately arrested him, it was not clearly established that the existence of probable cause was not an absolute defense to an abuse-of-process claim").

As the Supreme Court has noted, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999); *see also Safford Unified Sch. Dist. v. Redding*, 129 S. Ct. 2633, 2644 (2009) ("We would not suggest that entitlement to qualified immunity is the guaranteed product of disuniform views of the law in other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagree about the contours of a right does not automatically render the law unclear if we have been clear. That said, however, the cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, to counsel doubt that we were sufficiently clear in the prior statement of law. We conclude that qualified immunity is warranted."); *Zieper v. Metzinger*, 474 F.3d 60, 71 (2d Cir. 2007) ("the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'") (quoting *Hunter*, 502 U.S. at 229) (internal quotations and citations omitted)); *Moorman v. Thalacker*, 83 F.3d 970, 974 (8th Cir. 1996) ("The law of 'attempt' is complex and fraught with intricacies and doctrinal divergences. Qualified immunity protects prison officials from liability for their objectively reasonable efforts to divine whether a course of conduct amounts to an 'attempt,' even should their answer be arguably wrong.").

In short, given the lack of clarity in this Circuit on whether the existence of probable cause for the issuance of the tickets would be a complete defense to an abuse of process claim based upon the issuance of such tickets, defendant Nudo is entitled to qualified immunity. Based upon language in both

Second Circuit and district court cases suggesting that probable cause is a defense, although the right to be free from abuse of process was clearly established as a general proposition, it would not be clear to a reasonable officer that his conduct was unlawful in the situation confronted by Nudo in which he had probable cause to issue the tickets. Thus, this Court cannot say that, in the light of pre-existing law, the unlawfulness of his conduct was apparent. *See Anderson*, 483 U.S. at 640. Accordingly, defendant Nudo is entitled to summary judgment on grounds of qualified immunity for the abuse of process claim against him.[6]

### B.  The Fourth Amendment Claim

Defendant Poulos contends that the Court erroneously denied summary judgment on the Fourth Amendment claim, which relates

---

[6]  Because the Court has found that Nudo is entitled to summary judgment on qualified immunity grounds, the Court need not address defendant Nudo's alternative argument in the motion for reconsideration—namely, that plaintiffs did not offer any evidence to support this claim.  The Court also notes, as it did in the September 23 Memorandum and Order, that no municipal liability could be imposed on the Village based upon Nudo's actions because there was no evidence, nor any argument, that Nudo was a policymaker.  *See* Memorandum and Order, at 54 n. 45.  Although plaintiffs seek to resurrect this claim in their post-oral argument opposition to the motion for reconsideration (s*ee* Pls.' Post-Oral Arg. Mem. of Law, at 20-22), the Court rejects that argument procedurally (because it is too late) and substantively because  there is insufficient evidence in the record to support a rational finding by a jury that a municipal policy, custom, or practice existed to deprive individuals of their rights through the way in which tickets are served to violators of the law.

to  the warrantless entry into the basement by the Fire Department, and then by Poulos himself.  In particular, Poulos contends the following: (1) plaintiffs have no standing to challenge his entry into the basement; (2) there is no genuine issue of fact as to whether exigent circumstances existed in the basement; and (3) Poulos is entitled to qualified immunity.   All of these arguments were thoroughly addressed and rejected by the Court in the September 23 Memorandum and Order. For the reasons set forth in the September 23 Memorandum and Order, and as discussed below, the motion for reconsideration on this claim is denied.

### (1) Standing

Poulos argues that "in granting plaintiff standing to challenge the entry, this Court overlooked the wealth of case law in this Circuit, holding that users of a common area in an apartment building do not have a legitimate right to privacy and, as such, cannot assert Fourth Amendment protections."  (Defs.' Mem. of Law, at  2.)  However, as discussed below, that argument completely misconstrues the Court's holding—namely, that the double-locked private room in the basement owned and maintained exclusively by plaintiff John Mangino, which was opened and entered during the search, provided standing for Mr. Mangino to bring a Fourth Amendment claim challenging the entry and search.  *See* September 23 Memorandum and Order, at 25 ("Because Mr. Mangino has presented evidence that he had not only a possessory right but also exclusive access to this room, which was kept double locked, plaintiffs have presented sufficient factual evidence from which a reasonable jury could conclude that he has standing to present his Fourth Amendment unlawful search claims.")

In the motion for reconsideration, Poulos cites a series of cases for the well-settled legal principle "that the common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors." *United States v. Holland*, 755 F.2d 253, 255-56 (2d Cir. 1985) (collecting cases); *accord United States v. Gray*, 283 Fed. App'x. 871, 873 (2d Cir. 2008) (summary order). Numerous courts have applied this rule to a common basement area utilized by all tenants in a multi-family dwelling, as well as storage areas shared by tenants. *See, e.g., United States v. McGrane*, 746 F.2d 632, 634 (8th Cir. 1984) (tenant did not have reasonable expectation of privacy in common storage area of complex that was "accessible to all tenants and the landlord"); *United States v. Thornley*, 707 F.2d 622, 624-25 (1st Cir. 1983) (no reasonable expectation of privacy in an unlocked storage area in apartment building); *United States v. Rudaj*, No. 04 CR 1110, 2005 WL 2420360, at *4 (S.D.N.Y. Oct. 3, 2005) ("to the extent that the storage room was a common area of a multi-tenant building, as [defendant] maintains, [defendant] did not have a reasonable expectation of privacy in that room").

However, these cases are inapposite to the factual situation present in the instant case because, contrary to Poulos' assertion, the Court did not base its finding of standing on Mr. Mangino's interest in the common area of the basement, nor was it based on storage areas leased to tenants for additional rent. Instead, this Court's decision on standing was based upon the double-locked private room in the basement that was owned and exclusively used and controlled by Mr. Mangino. In particular, as explained in the September 23 Memorandum and Order, Mr.

Mangino made the following uncontroverted statement in his affidavit about his exclusive ownership and control of that private room in the basement:

> there was a separate and private room which [Mr. Mangino] continuously had exclusive possession and sole use of. The door to this private room had a double pad lock, and [Mr. Mangino] was the only person that possessed a key to this room. [He] used the room in the basement for [his] own personal use. This room contained, amongst other things, DVR electronic security equipment for the premises, a monitor, desk and chair, tools, CD's, and personal papers. [He] had an expectation of privacy in [his] private room, and kept the door locked at all times to preserve [his] privacy as well as to secure [his] personal belongings.

(*Id.* ¶ 4; *see also* Pl. Vill. 56.1 ¶ 19.) As the Court also noted in the September 23 Memorandum and Order, Mr. Mangino contends that, on July 25, 2005, during the search of the premises by the Fire Department, he was ordered to unlock the door to his private room by the Fire Department. *See* Mangino Aff. ¶ 5 ("On July 25, 2005, I was ordered, over my objection, to unlock the locked door to my private room by the Fire Department. I unlocked and opened the door, and the Fire Department entered.") He further claims that this door was left open while various personnel were present on the premises, where the contents of the private room were in plain view to all, including Fire Marshall Poulos. (*Id.* ¶¶ 6-8; *see also* Mangino Vill. 50h at 45-48.)

It is axiomatic, given the uncontroverted evidence that landlord Mangino had exclusive

10

control over that locked room in the basement and stored his personal items there, that he has Fourth Amendment standing to challenge any entry and/or inspection of the contents of that room. *See generally United States v. Hamilton*, 538 F.3d 162, 169 (2d Cir. 2008) ("There is no authority for the proposition that one need live in the premises . . . in order to enjoy a privacy interest in those premises. Privacy interests have been found with respect to business premises and storage lockers."); *see also United States v. Chaves*, 169 F.3d 687, 691 (11th Cir. 1999) ("[Defendant] seems to have had the only key and, what is more, he also kept personal and business papers at the warehouse. In these circumstances, the Fourth Amendment protects [defendant's] privacy interests in warehouse."); *United States v. Davis*, 932 F.2d 752, 757 (9th Cir. 1991) ("[Defendant] had a legitimate expectation of privacy in the place searched. He had a key to Andrews' apartment, and was free to come and go as he pleased. He stored things there, and took the precaution of storing items in a locked safe to assure privacy."). Poulos almost conceded this point in his brief. *See* Defs.' Mem. of Law, at 17 n. 13 ("At most, plaintiffs arguably maintain a privacy interest in the locked room only."). In fact, counsel for Poulos did concede that point at oral argument:

> THE COURT: . . .The situation here was it is a locked room that only he had the key to; right?
>
> MR. RADI: Right.
>
> THE COURT: So it would be the equivalent of an apartment. It may be a small apartment or a small room but certainly he has an expectation of privacy in that particular room. You

have the arguments with respect to that but he has an expectation of privacy on that room; correct?

> MR. RADI: In only that room.
>
> THE COURT: Okay.
>
> MR. RADI: Right.

(January 6, 2011 Tr., at 5.)

In sum, this Court adheres to its ruling that Mr. Mangino had standing under the Fourth Amendment to challenge, at a minimum, entry into his private room in the basement area of the building. Accordingly, Poulos' motion for reconsideration on that ground is denied.[7]

### (2) Material Issues of Fact Regarding Any Purported Exigency Justifying Warrantless Entry

Defendant Poulos also contends that "[e]ven if plaintiffs have standing to challenge Poulos' entry into the basement, the Court should have granted summary judgment because the evidence demonstrates that there were exigent circumstances in the basement that Poulos was required to investigate." (Defs.' Mem. of Law, at 17.) In particular, defendant argues that there were no controverted facts on the issue of exigency. That contention is simply incorrect. Moreover, defendant Poulos asserts that the Court's sole

---

[7] In connection with his standing issue, Poulos also contends Poulos has no liability for the entry and inspection of that private room because the Fire Department entered the room first. However, that is not a question of standing; rather, that issue relates to whether Poulos may have liability for any alleged unconstitutional entry into the room. Thus, the Court addresses that argument *infra*.

basis for concluding that a disputed issue of fact existed as to exigency was Chief Wagner's inability to recall that he, according to Poulos, instructed Poulos to enter the basement. That argument is also incorrect and misunderstands the Court's ruling. As set forth below, plaintiff put forth evidence regarding the circumstances leading up to the Fire Department being contacted, as well as the circumstances at the scene, that—if accepted as true and all reasonable inferences are drawn therefrom—most certainly was sufficient to create a material issue of fact on whether defendant Poulos fabricated the purported exigency at the residence in order to use the Fire Department to gain access to a building that he wished to search, without a warrant, for code violations.

As an initial matter, plaintiff put forth evidence that directly contradicted the sworn testimony of Poulos regarding the purported exigency that prompted him to contact the Fire Department so that the apartment could be searched. In his deposition, Poulos asserted that the exigency was based upon a call the a resident of the building—Dawn Gucciardo—on July 25, 2005 regarding arcing or sparking wires in her apartment. In particular, he testified that he was "informed of sparking wires in an apartment at the Village office, the girl was—a tenant was on the phone and she wanted someone over there right away. That's when I went right over to determine what the problem was." (Poulos Dep. at 211.)[8]

However, Ms. Gucciardo, who was the purported source of the exigency, contradicted under oath this critical testimony proffered by defendant Poulos. Specifically, Gucciardo testified that, on the morning of July 25, 2005, she did not call the Fire Department, did not call the Suffolk County Police Department, did not call for an ambulance, and did not call the Village of Patchogue. (Gucciardo Dep. at 230-31.) Not only did Gucciardo deny making any telephone call on July 25, 2005 to prompt Poulos or the Village to contact the Fire Department, she testified that at no time did she ever complain of arcing or sparking wires, or any other similar condition. *See, e.g.,* Gucciardo Dep. at 138-39 ("Q. Have you ever talked about an arching outlet? A. What's an arching outlet? Q. Did you ever talk about a sparking outlet? A. No. I don't remember any sparking outlet. Q. You don't remember a sparking outlet? A. No, I didn't have any sparking outlet.").

Ms. Gucciardo's sworn testimony alone — denying that the telephone call occurred on July 25, 2005 and denying that she ever complained of the condition that Poulos asserts was the exigency that prompted contacting the Fire Department and going to search the building—would be sufficient to create a genuine issue of disputed fact on whether the exigency existed. In fact, this point was essentially conceded by counsel for defendant Poulos at the oral argument for the motion for reconsideration:

> THE COURT: And my question to you on that is as I think made clear in the opinion but isn't there a factual dispute in this case regarding whether that

---

[8] Counsel for the Village defendants confirmed at oral argument on the motion for reconsideration that the exigency upon which Poulos relies to support the warrantless entry and search was the purported "sparking wires." *See* January 6, 2011 Tr., at 6 ("THE COURT: . . . .

The question of exigency, the reliance—the exigency that you're relying on is the sparking wires? MR. RADI: Right.").

exigency [*i.e.*, sparking wires] existed in the first place? Their position is that was a fabricated exigency by Mr. Poulos. Isn't there a disputed issue of fact on that?

MR. RADI: The disputed issue of fact is as to the initial search for the sparking wires. . . .

THE COURT: Wait a second. Before you even get to the radio communication [at the scene], you have to address the fact that the only reason there was an entry into the apartment—into the basement at all was as the result of your client calling into the exigency that we have to assume for purposes of the summary judgment motion[,] because of Ms. Gucciardo's testimony[,] was fabricated; okay? Right? Won't we have to assume that that was fabricated because she says she never said that?

MR. SOKOLOFF: You have to assume that; correct.

(January 6, 2011 Tr., at 6, 10.)[9]

———————————————

[9]  *See also* January 6, 2011 Tr., at 7:

> THE COURT: Well I don't—in her deposition, pages 230 and 231, she testified that she did not call the Fire Department or Village on July 25 and I don't believe she testified she ever said that she had sparking wires. She denied that she had ever made any such complaint; not only the date but that she never complained of that; right?
>
> MR. RADI: Right.

Moreover, as the Court noted in its September 23 Memorandum and Order, plaintiff also has pointed to other evidence to support its position that the exigency was fabricated, including the following: (1) inconsistencies in defendants' witnesses testimony regarding the alleged July 25, 2005 call; (2) the absence of any report or documentation by the Village regarding the alleged July 25 call, even though Village witnesses (including Poulos) conceded that it is the usual custom and practice of the Village to document and/or keep records of complaints made; and (3) Poulos did not call the Fire Department until he had arrived at the building and was told by Mr. Mangino and his lawyer that he would not be permitted to enter without a warrant, and the certified Dispatch Communications Sheet from the Fire Department indicates a report of "wires burning in building." (*See* September 23 Memorandum and Order, at 9, 29.)

In short, Gucciardo's testimony and the other evidence proffered by plaintiff is clearly sufficient to create a disputed issue of fact as to whether Poulos called the Fire Department on the morning of July 25, 2005 and fabricated an exigency to gain access to 21 Church Street to inspect for code violations, and not due to immediate concerns about an imminent fire in Gucciardo's apartment.

Defendant Poulos argues that, even assuming *arguendo* that he fabricated the exigency to justify the warrantless entry into

———————————————

> THE COURT: Isn't that her position?
>
> MR. RADI: That's her position.
>
> THE COURT: Okay. So, that's a dispute.
>
> MR. RADI: Right.

the building and the plaintiff's locked room in the basement by the Fire Department, he could not have violated plaintiff's Fourth Amendment rights because (1) it was the Fire Department who went into the building and plaintiff's locked room initially, not Poulos (who waited outside because of plaintiff's objection to his entry), and (2) the subsequent entry by Poulos was justified by a purported exigency found by the Fire Department in the basement once they entered, which allegedly required inspection by Poulos. The Court disagrees.

First, if Poulos fabricated an exigency to justify an unconstitutional, warrantless entry by the Fire Department that would allow him to search for code violations, he would still be liable for that unconstitutional search because he was utilizing the Fire Department (without their knowledge) as an arm or agent of the Village to facilitate what would have been an unlawful entry given the absence of the exigency. *See generally Kentucky v. King*, 563 U.S. - - - -, 131 S.Ct. 1849, 1862 (2011) ("Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency."). Law enforcement officers may not justify a planned warrantless search by maneuvering themselves (or others functioning as their agents) within the plain view of the object to be seized through an allegedly fabricated exigency. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 n. 26 (1971) (collecting cases and noting that they "can hardly be cited for the proposition that the police may justify a planned warrantless seizure by maneuvering themselves within 'plain view' of the object they want"). If plaintiffs can prove that the Fire Department was only acting on the fabricated exigency provided to them by Poulos and would not have entered and searched the private room

but for their interaction with Poulos, the Fire Department could be acting as the unwitting agent of Poulos for Fourth Amendment purposes. *See, e.g., United States v. Hardin*, 539 F.3d 404, 420 (6th Cir. 2009) ("In sum, because the officers urged the apartment manager to investigate and enter the apartment, and the manager, independent of his interaction with the officers, had no reason or duty to enter the apartment, we hold that the manager was acting as an agent of the government."). Under such circumstances, even if the Fire Department found an exigency once inside the building that warranted Poulos' subsequent entry into the building, that would not preclude liability by Poulos for orchestrating, through an alleged fabrication, the initial, unconstitutional entry by the Fire Department.

In any event, contrary to defendant's contention, there is also an issue of disputed fact whether any exigent circumstances were found once the Fire Department inspected the building that would support the subsequent entry by Poulos into the building without a warrant. In his written submissions, counsel for defendant Poulos asserts that "[i]t is undisputed that the fire department turned the investigation over to Poulos to investigate the dangerous conditions." (Defs' Mem. of Law, at 18.) This argument was repeated at oral argument where counsel asserted that it is undisputed that exigencies were found by the Fire Department once they entered, which supported the subsequent entry by Poulos. As discussed below, based upon the record, it is simply incorrect to contend that this fact—which is based primarily upon the testimony of defendant Poulos—is uncontroverted.

Poulos claims that Fireman Welsh radioed Chief Wagner from the basement, told him that there were dangerous conditions in the basement that needed immediate inspection by

Poulos, and that Welsh relayed that information to Poulos which required him to enter. However, as analyzed in detail in the Court's September 23 Memorandum and Order, there are several pieces of evidence that place this fact clearly in dispute. *See* September 23 Memorandum and Order, at 29-31. First, the firefighter who allegedly discovered an exigency, Matthew Welsh, testified that he did not see any imminent fire hazard during his search. *See, e.g.,* Welsh Dep. at 169 ("Q. Did you see anything that would cause immediate cause of fire, meaning something imminently about to combust? A. No."). Second, Chief Wagner did not recall receiving any information from his personnel regarding an imminent danger discovered during the inspection. (*See, e.g.,* Wagner Dep. at 164 ("Q. In this particular case, do you recall there being any calls from fire department personnel indicating there was any kind of hazards or dangers that they perceived in the premises? A. It's possible. Q. Do you recall any? A. Specifically, no."); *see also id.* at 175 ("Q. No signs of anything that would cause an imminent fire. A. Correct.").) In addition, Chief Wagner did not recall "what the exact cause was for turning it over to the fire marshal [Poulos]." (Wagner Dep. at 206.) Wagner stated that, although it was possible, he did not recall asking Poulos in. (*See* Wagner Dep. at 190-91.) However, Wagner acknowledged that, if there was an imminent problem at the scene, he would expect it would be noted in a Fire Department report, but no such report existed. (*See* Wagner Dep. at 207 ("Again, if there was an imminent problem, I would expect it to have been put down in a document.").) Finally, although Poulos points to testimony by Welsh that he relayed some problems in the building that the fire marshal may want to look at, Welsh did not testify that he viewed these conditions (*i.e.*,

wiring and bricks in a particular location) as imminent hazards, but rather "I probably told him [*i.e.*, the Chief] about the two violations and that he might want to have the fire marshal take a look at it. Something along those lines." (Welsh Dep. at 160.) Thus, Welsh did not testify that he made the determination that there was an imminent hazard, but rather noted that there may be a code violation and left it to the Chief as to whether the Fire Marshal should be brought in. (*See* Welsh Dep. at 159 ("I just passed it on to the chief and ask him if he wants to call the fire marshal.")).

Thus, contrary to the argument in Poulos' motion for reconsideration, although the Court noted that Chief Wagner did not recall telling Poulos that there was an urgent situation requiring his attention, that was not the sole basis for the Court concluding that there was an issue of disputed fact regarding whether the Fire Department discovered any exigency once they inspected the building that supported the entry of Poulos and, if so, whether that exigency was communicated to Poulos. Instead, the Court's conclusion that such a factual dispute existed (despite the testimony of Poulos) was based upon a combination of pieces of evidence—including that neither Wagner, nor Welsh, could recall any exigency that was discovered, nor was there any documentation of any exigency, as well as the evidence (discussed *supra*) suggesting that Poulos fabricated the initial exigency to justify the Fire Department's entry. Viewing the evidence in the light most favorable to plaintiffs, including drawing all reasonable inferences in their favor, there was clearly sufficient evidence in the record to raise a genuine issue of disputed fact as to whether there was an exigency discovered by the Fire Department, then communicated to Poulos, that would justify the warrantless entry by Poulos.

15

Finally, to the extent that Poulos again suggests that he is entitled to summary judgment because there is no evidence that he personally entered Mangino's locked, private room in the basement (as opposed to the Fire Department), the Court rejects that argument. As a threshold matter, as discussed *supra*, if it is proven that Poulos fabricated an exigency and communicated that exigency to the Fire Department to facilitate his warrantless entry into the building to look for Code violations, then he can be found to have violated plaintiff's Fourth Amendment rights by fabricating evidence that would have led to a search of plaintiffs' building, including the locked room in the basement. In any event, although there are no eyewitnesses to exactly what areas of the basement were searched by Poulos once he entered it, a reasonable inference could be drawn—if it is proven that he fabricated an exigency to look for code violations in the building and that he searched the basement area for such violations—that he also entered and checked the private room in the basement for such violations. Therefore, the absence of an eyewitness to his entry into the locked room does not support summary judgment in his favor on the Fourth Amendment claim; rather, this factual dispute, and which reasonable inferences to draw, are properly reserved in this case to the trier of fact. *See, e.g., Miller v. Fort Wayne Police Dep't*, No. 1:07-CV-163 TS, 2007 WL 3091581, at *2 (N.D. Ind. Oct. 18, 2007) ("Based on this record, it is reasonable to infer that he had a reasonable expectation of privacy in the searched house and that his property, within the house, was searched.").

In sum, accepting plaintiffs' evidence as true and drawing all reasonable inferences in plaintiffs' favor, the Court properly concluded in its September 23 Memorandum and Order that plaintiff had proffered sufficient evidence to create a genuine issue of disputed fact as to (1) whether Poulos fabricated an exigency on July 25, 2005 to justify a warrantless entry by the Fire Department that would facilitate his entry into the building to look for code violations; and (2) whether any exigency was found after the Fire Department entered the building, and whether such exigency was communicated to Poulos or other instruction given by the Fire Department, that would support his warrantless entry and search of the basement. Accordingly, the motion for reconsideration on this ground is denied.

(3) Qualified Immunity

Defendant Poulos also briefly argues that the Court erred when it found that he is not entitled to summary judgment on qualified immunity grounds. The Court disagrees. As discussed below, the Court carefully considered this argument in the initial motion and correctly concluded in the September 23 Memorandum and Order that, if all of the factual disputes are resolved by the trier of fact in plaintiffs' favor, Poulos would not be entitled to qualified immunity. Therefore, qualified immunity at this juncture is clearly unwarranted.

As a threshold matter, Poulos argues in a conclusory fashion that "absentee landlords who share common areas of apartment houses with tenants that live in those buildings do not have a clearly established right to challenge the warrantless entry of a government official" and thus, "it was objectively reasonable for Poulos to believe that he did not violate any of plaintiffs' constitutional rights by entering the basement without a warrant." (Defs.' Mem. of

16

Law, at 19-20.)  The Court, however, finds this argument unpersuasive for several reasons.  First, if Poulos orchestrated the Fire Department's search of the building based upon a fabricated exigency, such search was not limited to the common areas of the building; rather, it involved a search of several areas of the building, including Mangino's locked room in the basement, and also involved the use of thermal imaging cameras to allow them to see through walls. (*See* September 23 Memorandum and Order, at 9-10.)  Therefore, under the circumstances, Poulos had every reason to believe that the Fire Department search could include (and, in fact, did include) entry into private areas of the building.  Second, as noted earlier, there is also a disputed fact (drawing reasonable inferences in plaintiffs' favor) as to whether Poulos himself went into Mangino's private room when he went down into the basement after the Fire Department entered that room.  Third, to the extent Poulos also argues that he had no way of knowing that Mangino had an expectation of privacy in the building, that contention is undermined by the uncontroverted evidence that Mangino and his lawyer told Poulos when he arrived at the building that he could not enter without a warrant, which prompted Poulos to call the Fire Department.  (*See* September 23 Memorandum and Order, at 8-9.)  Therefore, if all of the facts are viewed most favorably to plaintiffs, Poulos cannot claim that he did not know Mangino had an expectation of privacy in the building or that the entry and search would go beyond common areas of the building.    Thus, qualified immunity on this ground at the summary judgment stage is unwarranted.

Poulos' only other argument for qualified immunity is similarly flawed.  In particular, Poulos argues that it was objectively reasonable for him to believe that he did not violate plaintiffs' rights by entering the basement because "the undisputed facts showing the existence of emergency conditions in the basement and Chief Wagner's instructions to Poulos to enter."  (Defs.' Mem. of Law, at 20.)  However, as discussed in detail *supra* and in the Court's September 23 Memorandum and Order, that fact is certainly in dispute and cannot be resolved on summary judgment.  Thus, if all of the factual disputes are resolved in plaintiff's favor—namely, (1) that Poulos fabricated an exigency in order to utilize the Fire Department to facilitate his unlawful entry and search of the building, and (2) even after the Fire Department entered and search the building and found no exigency, Poulos entered the building himself without a warrant to look for code violations—qualified immunity would not exist for Poulos. In others words, it certainly would be objectively unreasonable for Poulos to believe that it would be lawful for him to fabricate an exigency so that the Fire Department, and then Poulos, could enter and search a building over the landlord's objection.

As this Court emphasized in its September 23 Memorandum and Order, although the Court needs to determine the availability of qualified immunity "at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), the Second Circuit has held that courts should cloak defendants with qualified immunity at this juncture "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'"

17

*Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." (citations and quotation marks omitted)); *Stancuna v. Sherman*, 563 F. Supp. 2d 349, 356 (D. Conn. 2008) ("Here, the court finds that summary judgment on qualified immunity grounds is inappropriate. As the Second Circuit has held, [w]hen a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical. As noted above, there are issues of material fact in this case that this court may not decide. These issues of fact are critical to determining whether Sherman was operating under a reasonable belief as to what kind of search he was permitted to conduct." (citation and quotation marks omitted)).

Therefore, as discussed in detail in the September 23 Memorandum and Order, this is precisely one of those cases of qualified immunity that cannot be decided at the summary judgment stage. In fact, when the Court asked counsel for the Village defendants at oral argument how there could be qualified immunity if Poulos fabricated the exigency, counsel could not articulate a basis for qualified immunity:

> THE COURT: So you have to assume for purposes of summary judgment their version of the facts which is that Mr. Poulos fabricated the existence of sparking wires. How

can there be summary judgment on that? How can you have summary judgment or qualified immunity on that issue? If he fabricated the exigency, would he have qualified immunity?

> MR. RADI: If he made up the fact that there was an emergency, then I don't know. I don't know if he would have qualified immunity.

(January 6, 2011 Tr., at 8.)[10]

Given the disputed facts regarding whether Poulos fabricated the exigency so that he and the Fire Department could conduct an unconstitutional search, summary judgment on qualified immunity grounds on this claim is unwarranted under the circumstances of this case. Accordingly, the motion for reconsideration as to the Fourth Amendment claim on qualified immunity grounds is denied.

---

[10]  *See also* January 6, 2011 Tr., at 23 (THE COURT: So he gets a free pass on fabricating an exigency to get the Fire Department in there in the first place? You get a free pass on that? MR. SOKOLOFF: If he got— if there's proof that he got them in there in order to engineer his own entry—[.] THE COURT: Right.   MR. SOKOLOFF:—that would be a problem but there's no evidence of that.").

V. CONCLUSION

For the foregoing reasons, the Court grants the Village defendants' motion for reconsideration on the malicious abuse of process claim and the Court grants summary judgment in favor of defendant Nudo on that claim based upon qualified immunity. The Court denies the Village defendants' motion for reconsideration of the Court's denial of summary judgment on the Fourth Amendment claim arising from the entry and search of 21 Church Street.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 30, 2011
Central Islip, New York

* * *

Plaintiffs are represented by Robert A. Siegel, Esq., 205 East 60th Street, New York, NY 10022. The Village defendants are represented by Brian S. Sokoloff of Sokoloff Stern LLP, 355 Post Avenue, Suite 201, Westbury, NY 11501. The Fire Department defendants are represented by Jeffrey B. Siler, of Siler & Ingber, LLP, 1399 Franklin Avenue, Suite 103, Garden City, NY 11530.